# Hess' Appeal.

1. Under the Act of 22d of April, 1856, a parol declaration of trust in respect to lands cannot be enforced. A sale, by the trustee of lands held in trust, converts them into personalty; and a subsequent declaration of trust in respect to the proceeds of the sale impresses them with the trust, against the enforcement of which said Act raises no bar.

2. A debtor's books of account are not evidence to prove payments made by him to his creditor.

February 19th, 1886. Before MERCUR, C. J., GORDON, PAX-SON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Orphans' Court of *Lehigh county :* Of January Term, 1886, No. 321.

This was an appeal by Annette P. Hess and Robert J. Hess, administrators of James Hess, deceased, who was executor of the last will and testament of Mary Hess, deceased, from the decree of the Orphans' Court of Lehigh county, surcharging the estate of the said James Hess, deceased, with the proceeds of certain real estate sold by him to W. H. Deshler in 1873.

The facts appear in the opinion of the court, ALBRIGHT, P. J., sustaining the exceptions of Mrs. Mertz and Mrs. Haines to the Auditor's report :

Mary Hess, the decedent, died November 9th, 1883. She was in the 89th year of her age at the time of her decease. She left surviving her, issue three children, a son James, whom she appointed executor of her will made in 1875, and two daughters, Mrs. Mertz and Mrs. Haines. She devised a dwelling house, the only real estate she owned at the time of the making of the will, to the two daughters, and gave her personal estate to her three children in equal shares. James, the executor,

filed an inventory, taken December 18th, 1883. The property inventoried consists of a few articles of furniture and a note of James Hess, dated April 1st, 1882, to his mother for $1,800, upon which interest from April 1st, 1883, to December 18th, 1883, is charged, and a bond by said James, dated October 19th, 1841, for $700; upon the bond interest is inventoried as due from April 1st, 1883, to December 18th, 1883, said bond is conditioned for the payment to said Mary Hess, widow of John Hess, of the interest on the $700 annually from date during her lifetime, and at her decease the $700 to the legal heirs of said John Hess, of whom it is mentioned in said condition that said James was one.

It is apparent that the principal of said bond is no part of the estate of the testatrix. On the argument of these exceptions counsel for all the parties interested signed an agreement, appended hereto, stipulating that it shall be treated as though it were one of the assets of the estate, and as though the principal were payable to Mary Hess. There is no reason why the wishes of all concerned should not be regarded; it will be treated as part of testatrix's estate.

James Hess died after the taking of said inventory. The account in this estate, filed December 30th, 1884, was settled by his administratrix.

Mary Hess resided at Allentown, and her widowed daughter, Mrs. Mertz, and her children lived with her. Her son, James, resided at Easton, was in active business, and was possessed of considerable means.

Up to April, 1871, Mary Hess owned a town lot in Allentown, of a frontage of probably 60 feet, of which the lot which she devised was a portion. On April 21st, 1871, she conveyed a portion thereof—40 feet front—to said James; the consideration expressed in the deed is $2,700. On April 11th, 1873, James conveyed the same lot to William H. Deshler for $4,500, receiving in money $2,500, and a bond, secured by mortgage on the same premises for $2,000. Said mortgage has been satisfied, and, presumably, paid since the decease of James Hess.

It is alleged by Mrs. Mertz and Mrs. Haines that James Hess was never the owner of said lot of ground; that it was conveyed to him at his request merely to enable him to make sale of it for his mother's benefit; that no part of the $2,700 mentioned in the deed to him, was ever paid; that he sold to Mr. Deshler for his mother's benefit, and held the mortgage for her; and it is now demanded that the accountants be surcharged with the amount of said mortgage, with interest from September 1, 1883 (conceding that Mrs. Hess received all the interest to that date), and also surcharged

with $500, part of the $2,500 which it was said was paid down when the agreement of sale to Deshler was made, it being alleged that said $1,800 promissory note represents what is owing of the $2,000 paid when the deed to Deshler was given. This is resisted by accountant, who asserts that James actually purchased the lot, held it and the proceeds of its sale free of any trust; that the $2,700 was paid, and that said $1,800 promissory note is a renewal of an earlier and larger one, and represents all that is owing of said $2,700.

The further position taken by accountant's counsel in this reference is, that even if James Hess took the title impressed with the trust alleged, that, inasmuch as it was not manifested by writing, it was within the Act of April 22d, 1856, and void; and that even if there should be a resulting or implied trust, it cannot be enforced, because no proceedings to enforce it were commenced within five years after the alleged equity accrued, as is required by the sixth section of said Act. Counsel for the contesting legatees apparently concedes the strength of said objections if applied to the title to the land itself, but contends that because James Hess sold the land, and because it can be found that he admitted that he held the purchase money and the mortgage in trust for his mother, that said Act of Assembly does not apply, and that his representatives must account for said purchase money. . . . .

The evidence bearing upon the point now under consideration beyond any reasonable doubt establishes the fact that James Hess held the title in trust for his mother, Mary Hess; and the further facts that after he had sold the land to Deshler he declared that the mortgage belonged to his mother; that he treated it as his mother's property; and that the $1,800 note given to his mother (the one now in existence, was evidently given in place of a former one for the same debt) represented in part the purchase money which had been paid cash at the time of the conveyance to Deshler. It is also, undoubtedly a fact that the said $1,800 note was all that was owing of said $2,500, and that the claim for the $500 is not sustained.

In addition to what has been said respecting the ownership of the mortgage, it appears that after the title was in James' name, the lot continued to be assessed in the name of Mrs. Hess, and it seems she paid the taxes. She was an aged widow of hardly any resources, except the lot of sixty feet frontage, which afforded her a home and perhaps a small income. Her widowed-daughter, and the children of the latter, living with her, were poor and worked for a living. James seems to have been wealthy. It is highly improbable that she would have given, or he accepted, the lot at much less than it was worth. He was a kind son and attentive to his

mother. I think it is not only plain that the mortgage belonged to the mother, but also that if James were living he would say so. He repeatedly said so, while living, to his mother and to others interested to know the truth of the matter. His declarations in this reference were not made to strangers to the transaction. It is probable that the reason why the mortgage was not included by him in the inventory was because it did not stand in the mother's name, and the money had not been realized when the inventory was taken.

Counsel for accountant offered in evidence before the Auditor the books of accounts of James Hess, deceased, and calculations made by him to show the nature of the transactions between Mrs. Hess and James, and that he owed her nothing but said $700 bond of 1841, and $2,700 consideration money for the land, and how he paid to her from time to time and upon what account; that by certain payments and transactions said $2,700 was reduced to $1,800, for which the note was finally given; said books were also offered to rebut the theory that James held the title to, or the proceeds of the sale of the lot for his mother. The books were received in evidence.

I cannot agree with the learned Auditor that the books are receivable in evidence upon the offer of the party who made them, and to prove the facts sought to be established by them. The learned Auditor concluded that the relation of Mrs. Hess and James was that of principal and agent; that she entrusted her money to him, and that he supplied her with small sums as she needed it, and attended to and paid for matters relating to her property. Upon an examination of the cases cited by the Auditor, I conclude that they do not support his position. Among the strongest is that of Ege's Appeal, 2 W., 283. There it was held that a son, who had been a manager of iron works for his father in his lifetime, and who after his death, became his administrator, on the settlement of his administration account was entitled to credit for a sum in his favor on the cash book. But as the court said those were the books of the employer, the owner of the works, and open to his inspection, and that the presumption was that he did inspect them, and was satisfied with their correctness. So in the case of Haimes v. Barnitz, 8 W., 39, also relied on by the Auditor. There entries in a book of payments made for another were received in evidence, because accompanied by proof that the person to be affected had constant access to the books and assented to the entries.

The books here in question were not the books of Mrs. Hess, but the books of James, used in his business in Easton. It does not appear that she ever saw his books, nor that he

ever rendered her an account taken from them. The entries offered are in the nature of declarations made by a party in his own favor in the absence of the party to be affected. If the books were received, their principal effect would be to prove that the party who made the entries therein discharged a debt, because he made entries of payments by himself in his own books, which the other party never saw, nor had the opportunity of seeing. This differs widely from Welsh *v.* Cooper, 8 Barr, 217, also cited by the Auditor, where books of a store, the ownership of which was in dispute, were received to show that the party, whose books they purported to be, was in possession of the store, and the manner in which the business was conducted.

Nothing is plainer than the fact that if Mrs. Hess or her representatives were claiming the real estate which James Hess took by his deed from his mother, against James or his heirs, that the case would be exactly within section 4 of the Act of April 22d, 1856 (Purd. Dig., 831), and that the claimants would fail because the alleged trust was not in writing; and that if there was a claim of the title upon the theory that there was a trust as to the land resulting from implication or construction of law, that the parties claimant could not succeed, because the demand or claim was not made within five years from the time the equity or trust accrued : Section 6 of said Act (Purd. Dig., 1064).

Can the proceeds of the sale of the land represented by the bond and mortgage paid to the accountant be recovered, James Hess having held the title in trust for Mary Hess, and he having sold the land and thereafter declared that he held said mortgage for her—that it was hers ?

In Everhart's Appeal, 10 Out., 349, a bill in equity was brought to compel an account. The plaintiff averred that he and the defendant were partners in the business of farming and of buying and selling lands. The defendant had taken the title to the lands in his own name; he invoked the Statute of Frauds. The Master held that, because of the statute, the plaintiff could not enforce the trust as to all the lands, but that in the case of certain lands purchased under the partnership and sold by the defendant, and where the latter subsequently to the sale had acknowledged plaintiff's right to share in the profits, and had agreed to pay over his share, the statute did not apply, in that the plaintiff was entitled to an account as to such converted proceeds. This view was adopted by the Common Pleas, and its decree was affirmed by the Supreme Court. Said the latter court: " The reason for the distinction, as expressed in the report, is, that the testimony of the plaintiff and several of his witnesses establishes

declarations and admissions by the defendant, made after the sale was concluded and money paid, recognizing the plaintiff's interest in the proceeds of the sale, and these, being personalty, may be the subject of a parol contract. This view of this part of the plaintiff's claim appears to be in accordance with the authorities," referring to Maffit v. Rynd, 19 P. F. S., 380. In that case Justice SHARSWOOD, in the course of the opinion, says: " For assuredly it cannot be disputed that if a deed of land be made to A. and B. upon a parol trust, that they will hold for the benefit of the grantor or a third person, which parol trust cannot be enforced against the land in consequence of the fourth section of the Act of April 22d, 1856 (P. L., 533), yet if they sell the land and convert it into money, a parol declaration made by them subsequently to such sale and conversion will be entirely effectual. The statute raises no bar as to the enforcement of a parol declaration of trust in respect to personal estate."

These authorities upon the facts found by this court, are decisive of the question whether or not the representatives of Mary Hess can recover the money secured by the mortgage. They can recover it, and the accountants are surcharged with what they received upon the mortgage. William H. Deshler says that on April, 1884, six months interest was due; it is not shown when the mortgage was paid; it was satisfied on May 23d, 1885. Interest from October 1st, 1883, to May 23d, 1885, will be calculated—$187.66. The amount of interest will be reduced if it is shown to the court within a reasonable time that the mortgage was paid earlier. The accountant should be charged only with what he received. That Mrs. Hess received all the interest due in her lifetime is apparent. The surcharge thus made is $2,187.66. . . . . . A decree surcharging the administrators was accordingly entered, whereupon they took this appeal, assigning for error:

*First.*—The court erred in surcharging the accountants in the sum of $2,187.66.

*Second.*—The court erred in finding that the conveyance in 1871, from Mary Hess to James Hess, was not a valid and absolute sale of the premises.

*Third.*—The court erred in finding that James Hess held the $2,000 Deshler mortgage in trust for his mother, Mary Hess.

*Fourth.*—The court erred in rejecting the books of James Hess.

*Frank Reeder* for appellants.—1. The present appellants took the legal position in the court below and before the learned Auditor, that if the facts of the case disclosed an express trust

in James Hess for the benefit of his mother, Mary Hess, the trust itself was invalid and void, because not "manifested by writing signed by the party holding the title"—James Hess— as required by the terms of section 4 of the Act of April 22d, 1856; and that if the facts disclosed a resulting or implied trust, it could not now be enforced against James Hess, because no proceedings were commenced to enforce it within five years after the alleged equity accrued, as provided by section 6 of the same Act of April 22d, 1856.

2. The learned Judge of the lower court decides, as matter of fact, that the title to the land in question was held by James Hess in trust for his mother, Mary Hess, and that the conveyance by her to her son was not a valid and absolute sale.

The legal principle would be accurately stated if we were to say that there must be affirmative proof that there was no consideration for the conveyance to justify a court in saying that a deed is a nullity. The deed in question contains in its customary place a recital of the payment of the purchase money, and endorsed upon an outer fold a receipt for the same, duly signed by Mary Hess and witnessed by the alderman before whom the instrument was acknowledged. Mrs. Haines and Mrs. Mertz claim adversely to the deed, in right of Mary Hess, who was the grantor thereof, and as against her and them the receipt is good : Lutton *v.* Hesson, 6 Harris, 109; Lloyd *v.* Lynch, 4 Casey, 419; Penn. Salt Co. *v.* Neel, 4 P. F. S., 9; Pringle *v.* Pringle, 9 P. F. S., 281.

3. The court erred in rejecting the books of James Hess. It was contended that the books were not properly proven, but the court below did not sustain this contention. They were proven in the manner prescribed by law, being the books of a deceased person. Two witnesses swore that the books were in the handwriting of James Hess, and one witness testified that they were found among his books after his death : Odell *v.* Culbert, 9 W. & S., 66; Hoover *v.* Gehr, 12 P. F. S., 136.

The legal determination of what is the proper subject of a book entry has been based upon sound and recognized rules of evidence which uniformly reject secondary proof and demand the best evidence attainable. Under this line of reasoning the book entries of James Hess should be considered : Corr *v.* Sellers, 4 Out., 170; Myers *v.* Brice, 2 Penny., p. 392.

The essence of the question now at bar is an allegation of fraud. The rule that great latitude should be allowed in the admission of circumstantial evidence on a question of fraud should, especially in a Court of Equity, be applied for the protection of the innocent defendant, as well as for the punishment of the wrong doer : Swazey *v.* Herr, 1 Jones, 278;

Nourse *v.* McCoy, 2 Rawle, 70; Klein *v.* Ins. Co., 1 Harris, 247.

Facts which bear upon the question of *bona fides* ought to be admitted in evidence: Vankirk.*v.* R. R. Co., 26 P. F. S., 66.

*James B. Deshler,* for appellee.—Although a conveyance of land with a parol trust to hold for the benefit of the grantor be not enforceable under the Act of April 22d, 1856, yet a parol declaration of trust by the grantor after its conversion into money will impress the proceeds with the trust: Maffit's Adm. et al. *v.* Rynd et al., 19 P. F. S, 380; Everhart's Appeal, 10 Out., 349; Benjamin *v.* Zell, 4 Out., 33.

The law in this case is not in dispute, and the cases above cited are conclusive upon the facts as the court below finds them, and as we think they exist.

The books offered in evidence were the day-books and ledger used by Mr. Hess in his different business enterprises, running over a large number of years, comprising a large number of books, and covering a large multitude of business transactions. There is no proof that Mrs. Hess ever saw these books, nor, indeed, that she ever knew that such books were in existence.

From the Auditor's reasoning, it would appear that he thought that these books must be admitted, because no other evidence existed of the transactions between James Hess and his mother.

But certainly the rule that when primary evidence from the very nature of the case cannot be had, secondary evidence may be admitted, cannot be applicable here. If James Hess then made payments of interest to his mother on bonds and notes that he owed her, or made other payments to her, it was his duty to take proper vouchers for such payments.

Mr. Justice STERRETT delivered the opinion of the court, March 1st, 1886.

Notwithstanding the very able argument of the learned counsel for appellants we are not convinced that any error to their prejudice has intervened. An examination of the testimony, in connection with the Auditor's report and the well-considered opinion of the court below, has satisfied us that the surcharge complained of in the first and third specifications was fully warranted.

While there is some testimony tending to prove the contrary, it is clearly and satisfactorily shown that James Hess accepted and held the title to the lot in question, in trust for his mother; and, when he shortly afterwards conveyed it to W. H. Deshler, the consideration money was secured and held

[*Jones v.* Bland.]

by him upon the same trust. The testimony of Mr. Deshler to that effect is so distinct and positive, and so fully corroborated by other facts and circumstances, that there can be no doubt such was the distinct understanding between James Hess and his mother. The existence of the trust, and its recognition by both parties before as well as after the sale and conveyance to Deshler, is clearly and conclusively established. So far as conversion of the land into personalty is concerned, the trust was executed. The appellees are not seeking to enforce it against the land, and hence the provisions of the Act of 1856 cannot stand in their way: Maffit *v.* Rynd *et al.*, 69 Pa. St., 380. When the property was conveyed to Deshler, Hess accounted to his mother for the greater part of the hand money, and took a mortgage to secure the deferred payment. Both the learned Auditor and the court below found, in substance, that he held the title, as above stated, in trust for his mother; and after the sale to Deshler declared the mortgage belonged to her, and treated it as her property. If so, it is rather late to do what Hess, in his lifetime, never attempted— repudiate the trust.

. For these and other reasons, fully elaborated in the opinion of the learned president of the Orphans' Court, we think the accountants were rightly surcharged with the sum of $2,187.66. The first three specifications are therefore not sustained. The court was also right in holding that the books of James Hess were not competent evidence for the purpose for which they were received by the Auditor.

Decree affirmed and appeal dismissed at the costs of the appellants.