# CHARLESTON.

## FLOYD *v.* DUFFY.

### Submitted March 30, 1910.　Decided December 6, 1910.

1. TRUSTS—*Creation—Statute of Frauds—Declarations of Trust in Land.*

   Creations and declarations of trusts in lands may be made and proved in this state as they could be in England, before the English Statute of Frauds, the seventh section of that statute, requiring the proof of such creations and declarations to be in writing, never having been in force in this state.

2. SAME—*Constructive Trusts—Unenforceable Contracts for Sale of Land.*

   Though no contract for the sale of land is enforcible either at law or in equity, unless it be in writing, and no estate in land for more than five years can pass except by deed or will, there

68 W. Va.

are many instances in which courts of equity except transactions, relating to land, from the operation of these provisions, on the ground that they stand upon equities independent of the contracts attending them, and establish constructive trusts in favor of grantors as well as persons not mentioned in the deed.

3. SAME—*Interest in Real Property.*

A conveyance of the legal title to land, obtained by the grantee in pursuance of a verbal agreement between himself and a third party, prior in date to the deed or contemporaneous therewith, for their common benefit, no purchase money having been paid by either of them, and it having been the intention and agreement of the parties to sell the land in small portions and pay for the same out of the proceeds thereof, as sold, and reconvey all that should remain unsold after a certain date, is not within the statute of frauds; and, by virtue thereof, the grantee took the legal title in trust for himself, the grantor and such third party.

4. SAME—*Conveyance of Land.*

If, in pursuance of a prior or contemporaneous agreement of copartnership to purchase and sell land for profit, one of the parties obtain a conveyance of the land to himself, proof of such agreement and conveyance, pursuant thereto, establishes a trust in the lands in favor of the other partner, not inhibited by the statute of frauds.

5. EQUITY—*Pleading—Variance Between Allegation and Proof.*

While, in equity, the *allegata* and *probata* must correspond, the rules for the enforcement of this principle in courts of equity are more liberal than those applied in actions at law, and an agreement in matters of substance only is required; it being sufficient that the cause of action made out by the bill and the evidence is substantially the same.

6. APPEAL AND ERROR—*Review—Equity—Failure to Mature Amended Bill.*

If, on appeal, it appears that the original bill is broad enough to admit the evidence and sustain the decree pronounced, the decree will not be reversed for failure to mature an amended bill, unnecessarily filed.

7. PLEADING—*Amended Bill—New Cause of Action.*

The trial court may properly allow an amended bill to be filed, after the evidence taken has developed a state of facts, variant from those set up in the original bill, but not constituting a departure, as defined by the courts, nor a new cause of action.

8.  APPEAL AND ERROR—*Review—Discretion of Court—Permitting Filing of Amended Bill.*

    The exercise of the discretion of the trial court, in permitting an amended bill to be filed, will not be disturbed by an appellate court, except in cases of abuse of such discretion.

Appeal from Circuit Court, Kanawha County.

Action by John B. Floyd against J. B. Duffy, administrator of Patrick Duffy, and others. Judgment for plaintiff, and defendants appeal.

*Affirmed.*

*Linn & Byrne* and *Mollohan, McClintic & Mathews,* for appellants.

*J. W. Kennedy* and *E. B. Dyer,* for appellee.

POFFENBARGER, JUDGE:

The object of the bill in this cause was an accounting by the estate of Patrick F. Duffy, deceased, for one-half of the proceeds of the sale of a large number of town lots, and partition of a few lots remaining unsold out of the property, all of which the bill alleges, was conveyed to Duffy to hold in trust for himself and the plaintiff, John B. Floyd. The plaintiff proceeds upon the theory of a purchase of 137 lots, constituting what is known as the McClung Addition to the City of Charleston, at the price of $30,000.00, none of which was paid or intended to be paid at the date of the conveyance, but all to be paid out of the proceeds of the sale of the lots, at prices per lot agreed upon between McClung, the grantor in the deed to Duffy, on the one hand, and Duffy and Floyd on the other, if the lots could be sold within a specified time, and, if not, the balance to be paid or settled by a re-conveyance of the unsold lots at the prices agreed upon in the collateral agreement. While the deed from McClung to Duffy recites the payment of $6,000.00 in cash and the execution of three promissory notes for $8,000.00 each, the contention of the plaintiff is that no money was paid nor any notes executed at the inception of the transaction and that no interest on the purchase money was contemplated or paid for a period of three years after the date of the deed, at which time all purchase money was to be paid out of the sales of lots and by re-conveyances of the unsold lots, if any. The deed from

McClung to Duffy bears date May 7, 1890. Lots were conveyed by Duffy as early as July, 1890, and he continued to make conveyances for a number of years, but having later become financially embarrassed, and his creditors having acquired liens on the property, he was unable to proceed further with the enterprise. Two of the lots were judicially sold, at the instance of his creditors. About the year 1901, a friend of his purchased a number of the judgments and allowed him to make private sales of sufficient property, through an attorney in fact, appointed for the purpose, to pay off all, or practically all, of his debts. In this way, all of the McClung property, except about 33 lots, was sold, and the proceeds went into the hands of Duffy or to his creditors. In March, 1905, Duffy died. At and immediately before the conveyance to Duffy, and from that time until he became financially embarrassed, Floyd undoubtedly had relations with him respecting the property. He was active in effecting sales of the lots. He seems to have incurred some expense in cutting a ditch for the benefit of the property and otherwise interested himself in the promotion of the enterprise. W. E. R. Byrne, the attorney in fact, and Duffy's heirs deny all knowledge of any claim on the part of Floyd to any interest in the property until after the death of P. F. Duffy, and say they understood from the latter that Floyd was selling the lots on a commission. Declarations of P. F. Duffy to this effect are put in evidence by witnesses. A large amount of testimony was taken on both sides and the circuit court of Kanawha county rendered a decree, declaring that Duffy took title to the lots in trust for himself and the plaintiff, and referred the cause to a commissioner to state an account between the parties as a basis for a decree giving the relief prayed for in the bill. Pending the suit, the lots remaining unsold at the institution thereof were conveyed by Duffy's heirs to Isaac Loewenstein, in consideration of $27,000.00, the purchaser paying $7,000.00 in cash and executing notes for the residue.

As the trust alleged in the bill is predicated on parol evidence, it becomes necessary to determine, in the first instance, whether it can be so established. Assuming the agreement between Floyd and Duffy to have been made, before the deed was executed and delivered to the latter, it nevertheless remains that no money was paid on the purchase price by the plaintiff, nor,

indeed, anything more than a nominal sum by Duffy. All that was ever paid on the property seems to have been paid after the delivery of the deed. There was no agreement to pay anything otherwise than out of the proceeds of the sale of lots, as such sales should be made, Duffy and Floyd taking the excess of purchase money over the prices named in the collateral agreement, as their profit. Counsel for the appellee frankly admit that the trust is not in writing. They assert it is not a resulting trust, nor a constructive trust, but is an express trust which the law permits without writing. At common law no particular form of creation or declaration of a trust or use was required. It could be by deed, or will, or writing not under seal, or by mere word of mouth. Uses and trusts were simply averred and proved like any other facts and writing was not required. *Currence* v. *Ward,* 43 W. Va. 370; 28 A. & E. Enc. Law 869; Saunders on Uses and Trusts 152, m. p. 210; Perry on Trusts, section 75. In 1676, the English statute of frauds was passed, the seventh section of which required all declarations or creations of trusts or confidences in any land, tenements or hereditaments to be proved in some writing signed by the party, enabled to declare such trust, or by his last will in writing. Saund. Uses & Trusts, *Id.;* Perry on Trusts, *Id.* Not being made expressly applicable to the Colonies, this statute was never in effect in Virginia, 28 A. & E. Enc. Law 873, but, in 1787, Virginia enacted a statute of frauds, the same, in many respects, as that of England, but omitting said seventh section, relating to declarations of trust. Nor has it ever been incorporated in the statutes of this state. Hence, trusts in land may be declared in this state as at common law. *Currence* v. *Ward,* cited. However, every contract relating to land is not a declaration or creation of a trust. There is no pretense that Floyd obtained the legal title to the land. The utmost that he could have had was an equitable title, based upon his parol contract. If he had paid money, his right would have rested, not upon the agreement, but upon the payment, upon a fact of which the agreement was a mere attendant. Under the principles declared in *Currence* v. *Ward,* it suffices that the payment be made at or before the vesting of the legal title in the trustee. That did not occur in this case. No purchase money was ever paid until after the delivery of the deed. As to this, there is neither con-

troversy nor doubt. It is insisted, however, that an express oral agreement on the part of the grantee to hold in trust for a third party, antedating the vesting of the legal title, and to which the grantor was not a party, creates an express trust, permissible in this state, because our statute of frauds does not require the creation or declaration of a trust to be in writing. Would such an agreement be anything more than a contract to sell land? The purchaser takes the whole title in himself. Nothing is paid by the third party, and, consequently, his claim is based solely upon the agreement, and that agreement calls for the beneficial ownership of all, or a portion of the property, giving a right to call, in a court of equity, for the conveyance of the legal title. Such third person has no interest whatever in the land. Having had no previous right in it, and not having paid anything, there seems to be nothing upon which a court of equity can predicate relief, resting in conscience and not upon contract alone. This seems to put the case within another provision of the English statute of frauds, substantially incorporated in our law, denying remedy upon any agreement or contract for the sale of land unless it, or a memorandum thereof, is in writing. Code (1906) sec. 3438. Another statutory provision declares that no estate of inheritance or freehold, or for a term of more than five years in lands, shall be conveyed, unless by deed or will, Code (1906) section 3020. These provisions absolutely prevent the acquisition of any estate in land for more than five years by means of a mere verbal contract. There must be something more, an equity outside and independent of, or in addition to, the contract. There are numerous instances of such equities. If one person pay all or part of the purchase money and the conveyance is made to another, a resulting trust in favor of the party who paid the money arises. If one person has an equity of redemption in land and another purchases it at forced sale for the benefit of the debtor, taking the title in his own name as a mere security, and so stepping into the shoes of the creditor, the debtor may have the title back on re-paying the purchase money; or, if an absolute deed is found to be, under the peculiar circumstances of the transaction, in fact, only a mortgage, there is a trust relation. In all these instances and others to be found in the books, the *cestui que trust* either put money into the property or had an

antecedent interest in the land, constituting substantially the basis of an equity. It is this, not the verbal agreement, that confers right to invoke the aid of a court of equity, notwith-standing the statute of frauds. Such cases are held not to have been within the legislative intent, since to include them would make the statute work injustice, wrong and oppression. On the same principle, certain cases are excluded, in equity, from its operation, on the ground of actual fraud, since, in that forum, fraud vitiates everything in which it is found. Thus, many of the decisions say the mere intention of a grantee in a voluntary conveyance, that is, a conveyance not made upon a valuable consideration, not to hold in trust for the grantor, if such intention exist at the time of the conveyance, constitutes such fraud as to render the grantee a constructive trustee, he having previously agreed so to hold it. 15 A. & E. Enc. Law 1194. In cases of this class, the true rule seems to be that there must have been an original misrepresentation, by means of which the legal title was obtained; an original intention to circumvent, and get the better bargain, by the confidence reposed, Brown, on Stat. of Frauds, section 94; though some courts say the mere refusal to execute the trust suffices to establish fraud. Here, the ground of equitable relief and immunity from the statute, is the fraud perpetrated, not the agreement to hold in trust. All the instances named are designated constructive, not actual, trusts. In some the fraud is constructive; in others, it is actual; in all, courts of equity say it is against conscience to permit the holder of the legal title to deny the *cestui que trust* the benefit intended for him, and the conclusion and determination rest upon the facts and circumstances, not upon the mere sanctity of an agreement. Unless some such circumstances exist, a court of equity looks upon a contract exactly as it is viewed in a court of law. An agreement valid in law, is valid in equity, and one not valid at law will not be enforced in equity.

By the great weight of authority, if not, indeed, by all courts, an agreement on the part of one purchasing land with his own money and taking the conveyance in his own name, to hold it in trust for another person, or to re-convey it to the grantor, is within the statute of frauds. 15 A. & E. Enc. Law 1188. Likewise, if a voluntary grantee in a conveyance orally agree to hold the land in trust for the grantor, or re-convey it upon

demand, or to hold in trust for, or convey to, a third person, the agreement is generally held to be within the statute of frauds, unless circumstances exist, constituting an equity, such as confidential relationship between the parties or fraud in the procurement of the conveyance. 15 A. & E. Enc. Law 1192. As to this, the authorities are not uniform. Our leading case on this subject is *Troll* v. *Carter,* 15 W. Va. 567. There, the minority rule seems to have commended itself to the Court, as, in the fourth point of the syllabus, it is said that a volunteer will be held to the performance of the parol trust, because, to allow him to hold the land obtained by his promise to take it in trust for third parties, would permit him to commit a fraud. *Hardman* v. *Orr,* in 5 W. Va. 71, permits the establishment of such a trust and enforces it, but the authorities relied upon in the opinion are not, in a single instance, applicable to the question we are discussing. Hardman, in his lifetime, purchased land with money furnished by Hickman, who directed the conveyance to be made to Hardman and orally declared the land was to be held by him for the use and benefit of Mrs. Orr, Hickman's natural daughter, and, after a reasonable time, conveyed to her. No reference is made in the opinion to the statute of frauds. The Court merely said, "When the land was paid for with the money furnished by Hickman and the legal title vested in Hardman, the trustee, for the benefit of Mrs. Orr, a perfected and complete gift was made to Mrs. Orr, which may be enforced against the trustee or his heirs." This is followed by the observation that it is competent to prove the objects of a trust by parol evidence. All the cases cited to sustain the first proposition involved trusts created by deed or written contracts and nowhere in the opinion is the statute of frauds mentioned. The doctrine of *Troll* v. *Carter* above stated is reiterated in *Zane* v. *Fink,* 18 W. Va. 693, 715, and *Tichenell* v. *Jackson,* 26 W. Va. 460-67-68. The decisions of this Court above referred to leave undecided the question, whether an agreement on the part of the grantee, who has paid a valuable consideration for the land, to hold it in trust for a third party, is within the statute, but, as we have shown, it is held by the great weight of authority to be so, and we think this conclusion accords with reason and principle. If such a case is not within the statute, a trust may be engrafted, by parol evidence, upon almost any

conveyance. Proof of such an agreement is, as we have said, nothing short of a contract to sell and convey land. While the earlier cases do not decide it, *Nash* v. *Jones,* 41 W. Va. 769, *Currence* v. *Ward,* 43 W. Va. 367, and *Woods* v. *Ward,* 48 W. Va. 652, seem to settle the question in accordance with the view here expressed. In Pennsylvania, where this question has received much learned attention, a distinction has been marked between declarations of trust on the part of the grantor and like declarations on the part of the grantee. In *Kisler* v. *Kisler,* 2 Watts. 323-24-25, Chief Justice Gibson brought his great analytical powers to bear upon it. He said: "That an express trust may be declared by parol, I am not disposed to deny; but if declared by the grantee and not the grantor of the legal estate, where its object is not to indicate a beneficiary purpose by the grantor in favor of the *cestui que trust,* it must, to be binding, be made in consideration of payment of the purchase money by the *cestui que trust;* and then it would produce no other effect than the law would produce without it. Probably it was the object of the statute to sustain a gift of the land by the grantor to a person not named in the conveyance; but not a gift by the party purchasing, the execution of which could not be enforced for want of a consideration. If I proclaim that I hold my house for B, it is evidence of a trust which may, however, be rebutted by proof that the beneficial ownership is not in him; for such a declaration is not binding as a gift even of a chattel. But if I convey my house to A, with parol direction to hold it for B, a confidence arises which it would be unconscionable in A to violate; and this would constitute that species of express parol trust, which it was the object of our statute to sustain. But if I proclaim that I hold my house for B, on terms of conveying it to him when he shall reimburse me what I paid for it; this is not a trust, but a contract of sale within the operation of the prohibitory clause." See also *Robertson* v. *Robertson,* 9 Watts 32; *Raines* v. *O'Connor,* 10 Watts 313; *Fox* v. *Heffner,* 1 W. & S. 372; *Jackman* v. *Ringland,* 4 W. & S. 62; *Blyholder* v. *Gilson,* 18 Pa. 134; *Freeman* v. *Freeman,* 2 Parson's Eq. Cas. (Pa.) 81.

No doubt the McClungs could have declared a parol trust in favor of Floyd, under the principles just stated; but there is no evidence of any such declaration. They dealt with Duffy

alone. Floyd was not a party to the deed, nor does it appear
that he was a party to the alleged collateral agreement. He
dealt with Duffy, and had no prior interest in the land. Hence
the case does not fall within that class in which land, conveyed
for a specific purpose, comes back to the grantor, upon the
failure or accomplishment of such purpose, on the theory of a
resulting trust, resting upon implication. In such cases, there
is an independent equity in the grantor, growing out of a
former beneficial interest in him, which has passed from him
only partially or not at all, as in the case of a mortgage in the
form of a deed absolute on its face, or the conveyance of land
for a specific purpose which fails or has been accomplished,
leaving a surplus or residue in the hands of the trustee, or the
declaration of a trust by the grantor in favor of a third person.
This original beneficial interest, an established fact, shown by
parol evidence to have been conveyed only as security for a debt,
or to have been placed in the hands of the grantee as trustee
for the execution of certain purposes of the grantor, the full
accomplishment of which has required the use of only a portion
of the property, or which have wholly failed for some reason,
constitutes the basis of an equity outside of the deed and
measurably independent of it. A state of facts is thus dis-
closed which makes a claim of absolute ownership on the part
of the grantee contrary to conscience and variant from prin-
ciples of justice and equity. *Hess' Appeal,* 112 Pa. 168; *Rice*
v. *Rice,* 107 Mich. 241; *Thompson* v. *Thompson,* 30 Neb. 489;
*Pierson* v. *Pierson,* 5 Del. Chy. 11; *Haigh* v. *Kays,* L. R. 7
Chy. App. Cas. 469; *Lincoln* v. *Wright,* 4 DeG. & J. 15; *Booth*
v. *Turle,* L. R. 16 Eq. Cas. 182; *Troll* v. *Carter,* 15 W. Va.
567-77-78; *Sadler* v. *Taylor,* 49 W. Va. 104; *Thacker* v. *Morris,*
52 W. Va. 220; *Vangilder* v. *Hoffman,* 22 W. Va. 1; *Lawrence*
v. *DuBois,* 16 W. Va. 443; *Davis* v. *Demming,* 12 W. Va. 246.

Though the evidence gives no support to the theory of a
declaration of trust by the grantors in favor of Floyd and the
bills cannot be read as asserting one, and it is clear that the
latter never had any prior interest in the land, it seems reason-
ably clear that he may invoke the general principle declared
and illustrated by the authorities, just cited, if he has estab-
lished a state of facts, constituting an independent equity, a
right in respect to the property, resting in justice, equity and

good conscience, and not denied to him by the statute of frauds. An agreement between him and Duffy, made prior to the conveyance or contemporaneously therewith, to have the legal title to the land conveyed to the former for the joint benefit of both and subsequently to acquire the beneficial ownership by sales of the land in small portions and payment of the purchase money out of the proceeds of the same, would constitute, in our opinion, such an equity. Assuming this to have been their understanding and arrangement, the agreement was to buy and pay for the land. It was not a purchase by one and a re-sale to the other. In so far as it was a purchase at all, it was a joint one for their common benefit. Neither of them paid anything or bound himself to pay anything except contingently or conditionally. The legal title was taken by Duffy in pursuance of a prior or contemporaneous agreement between himself and Floyd to enable them to execute the agreement and effectuate its purposes. It was taken for their common benefit. That the statute of frauds does not inhibit such a contract seems to have been unequivocally asserted in *Currence* v. *Ward*, 43 W. Va. 367, and that *Ludwick* v. *Johnson*, 67 W. Va. 499 (68 S. E. 117), and 58 W. Va. 464, places such an agreement outside of the statute there can be no doubt. Thus, treated as a mere contract of purchase of land, creating an equitable interest therein, on the part of a third person, antedating the vesting of the legal title in the trustee or ostensible purchaser, or contemporaneous therewith, the agreement is not under the ban of the statute.

But the theory of this bill goes even beyond that. Floyd and Duffy may be said to have formed a partnership for the purchase and re-sale of this land, imposing upon each an equal burden for purchase money and expenses, and conferring upon each the right to an equal share of the profits, in pursuance of which Duffy took the legal title in his own name for their common benefit. That such a purchase is not within the statute, is attested by an abundance of authority. *Dale* v. *Hamilton*, 5 Hare 369; *Essex* v. *Essex*, 20 Beav. 442; *Miller* v. *Ferguson*, 107 Va. 249; *Chester* v. *Dickerson*, 54 N. Y. 1; *Fairchild* v. *Fairchild*, 64 N. Y. 47; *Traphagen* v. *Burt*, 67 N. Y. 30; *Clagett* v. *Kilbourne*, 1 Black. (U. S.) 346; *Bunnell* v. *Taintor's Admr.*, 4 Conn. 568; *Holmes* v. *McCray*, 51 Ind. 358; *Hirbour* v.

*Reeding,* 3 Mont. 15; *Welland* v. *Metchoir,* 8 Nev. 203; *Reajan* v. *McKibben,* 11 S. Dak. 270; *Moore* v. *Hamerstay,* 109 Cal. 122; *Moritz* v. *Lavelle,* 77 Cal. 10 (11 Am. St. 229). After having analyzed a number of cases, to determine whether proof of the acquisition of the legal title to land by a member of a co-partnership for the purposes of the partnership and in pursuance of the partnership agreement constitutes an independent equity, lying beyond the scope and influence of the statute of frauds, Sir James Wigram, the Vice-Chancellor, in *Dale* v. *Hamilton,* said: "The principle upon which I presume the above cases have proceeded has been partly the jurisdiction of the court in cases between partners touching the partnership property, and partly its jurisdiction to relieve against the fraud of a partner who should avail himself of his legal rights in violation of his partnership contract, a fraud, as against which no remedy, or no adequate remedy, could be had at law."

We think the evidence is sufficient to sustain Floyd's claim to an equal interest with Duffy in the land. Numerous witnesses testify to admissions by the latter. Some of these witnesses go so far as to say he admitted that they were equally interested in the land. This evidence is re-enforced by the conduct of the parties. Floyd was associated with Duffy in the very inception of the enterprise. He seems to have devised or arranged the plan under which the lots sold were to be disposed of. He was active in the sale of them. Other persons were employed to make the sales on a commission, and there is no intimation in the evidence that Floyd got any share of the commissions allowed them on the sales. Prospective purchasers were referred to him, upon disagreements as to price. He and Duffy together endorsed paper for McClung, and, in one instance, Duffy refused to endorse a note for McClung because Floyd declined to do so. A ditch was made for the benefit of these lots and to promote the sale of them. It was agreed that the cost of the construction of this ditch should be divided equally among, McClung, Duffy and Floyd. Opposed to all this evidence is some conduct on the part of Floyd which counsel for the appellants regard as sufficient to outweigh it. While sales were being made by Duffy's attorney in fact, Floyd did not interfere, nor set up any claim to the land. These sales did not continue for a long period of time. The power of

attorney was executed in November, 1901, and enough lots
had been sold by July, 1902, to pay off Duffy's debts. There
is no evidence of express disclaimer of interest on the part of
Floyd. The evidence is that he made no claim of title, and
said he was cultivating some of the lots by permission of Duffy,
and desired protection of his crops in case of sale thereof. We
do not see that he was under a positive duty to assert his title.
The lots had been purchased for re-sale. He may have deemed
Duffy's estate amply sufficient to re-imburse him for such of
his money as was appropriated to the payment of Duffy's debts;
and he may have thought it the better policy to allow fair sales
to be made, and he may have thought the rights of Duffy's
cerditors superior to his. An attempt was also made to weaken
the testimony of some of the witnesses by showing conduct on
their part inconsistent with their testimony. Here we have
direct conflict in the testimony of witnesses, but it arises in
respect to matters somewhat remote. The witnesses whose con-
duct is said to be inconsistent with their testimony adhere to
their statements and deny the conduct. Moreover, all of the
witnesses for the plaintiff are not so affected. Documentary
evidence is introduced to prove that Duffy paid McClung a
large part of the purchase money by assignments to him of
stocks, bonds, notes and otherwise; and, on May 18, 1894,
executed his note for $6,697.96, covering the balance due on
account of purchase money, and, on March 19, 1896, took a
receipt in full from McClung. Checks, given by Duffy to
McClung and wife and others for them, or in payment of their
debts, put in evidence, aggregate more than $10,000.00. These
facts are to be considered, of course, but they are by no means
conclusive against Floyd. The sale money went into Duffy's
hands and he, in the nature of things, would pay McClung.
If he could induce the latter to take stocks, bonds, notes and
property in lieu of money, that was perhaps to his advantage
and not to the detriment of Floyd. McClung says he had a
tacit, if not express, agreement with Duffy to take equal interests
with the latter in all his enterprises, and that Duffy took back
from him some of the stocks and other property. As to the
note for the balance, Duffy seems to have been already bound
for the amount by endorsements of McClung's paper, but if
he was not, his reluctance to re-convey the lots and his confi-

dence in their value, constituted a strong motive for extinction of McClung's equitable right for the common benefit of himself and Floyd. These transactions between Duffy and McClung, to which Floyd is not shown to have been a party, cannot alter or affect the original agreement, long antedating them. They are mere circumstances, bearing upon the question of original intent, purposes and agreement, and are not necessarily inconsistent with what the other testimony, facts and circumstances indicate it to have been. On the whole, we think the evidence sustain Floyd's claim. In reaching this conclusion, we have not considered his testimony which we think is inadmissible. That the agreement between him and Duffy was either prior to the date of the deed or coincident therewith, appears from the testimony of McClung and the circumstances he discloses.

Laches is also relied upon, but we think this defense not applicable under the circumstances. The trust was not repudiated nor disavowed until a very short time before the suit was brought, and this was before all the property had been sold. The trust had not then been fully executed.

A question of practice, remaining for disposition, has been postponed until now, under the belief that consideration thereof will be aided and simplified by the foregoing discussion of the facts and principles involved. The original bill sought an accounting for money, arising from the sale of lots, and partition of the unsold lots. The object of the amended bill was to correct certain errors of fact in the original bill, relating to the consideration for the deed to Duffy and the physical condition of the property, to make it conform more nearly to the evidence. The latter did not mention the collateral agreement. It exhibited the deed, reciting payment of $6,000.00 in cash and the execution of three notes for $8,000.00 each, as the consideration, without any express statement as to who paid the money or executed the notes. The bill alleged that Floyd and Duffy had agreed to purchase the land for which they were to pay $6,000.00 and execute three such notes. It alleged a joint purchase, and also a conveyance to Duffy for convenience. It also described the land conveyed as a tract of land. The amended bill, correcting these errors, did not change the nature of the demand, nor materially alter the basis thereof. The original bill set up an absolute joint purchase. As corrected,

it set up a conditional joint purchase. In both instances, a joint purchase was alleged, establishing the same relation beween the parties as regards the relief sought, the land having been fully paid for. Two of the defendants were non-residents. As to them there was an executed order of publication on the original bill, and process was served on one of them in the state. All the others were served. There was no process of any kind on the amended bill, but the administrator, as such, and in his own right as an heir, and two of the other heirs appeared to it. Assuming that the original bill is not broad enough to let in the evidence and sustain the decree, failure to mature the amended bill is assigned as error, calling for reversal. We are of the opinion, however, that the variance of the evidence from the original bill is not material and that the amended bill was not essential to the admissibility of the evidence or the decree. While, in equity, the *allegata* and *probata* must correspond, the rules for the enforcement of the principle are more liberal than those applied in actions at law. Agreement in matters of substance only is required in equity. If the cause made out by the bill and the evidence is substantially the same, relief will not be denied on the theory of a variance. Time and space need not be consumed here in stating the reasons for this liberality or the distinction between the practice at law and in equity. It suffices to refer to the authorities. *Wetherell* v. *McClosky*, 28 W. Va. 195; *Doonan* v. *Glynn*, 26 W. Va. 225; *Simpson* v. *Edmiston*, 23 W. Va. 675; *Floyd* v. *Jones*, 19 W. Va. 359; *Zane's Devisees* v. *Zane*, 6 Munf. 406-16; *Anthony* v. *Leftwich's Rep.*, 3 Rand. 238, 263, opinion of Judge Green. In some of the cases here cited, relief was denied on the ground of a total variance of the evidence from the bill, but they assert the general rule here applied. In others, it is both asserted and applied. See also Hogg's Eq. Pro., sections 550, 551, and Barton's Ch. Pr., p. 276. For the proposition that the filing of an unnecessary amended bill does not preclude relief on a sufficient original bill, *Seabright* v. *Seabright*, 28 W. Va. 412, is authority.

An assignment of error is based on the allowance of the amendment of plaintiff's bill. An amendment of a bill or declaration will always be allowed when substantial justice will be thereby advanced. Even in this Court, cases are remanded

with leave to amend, when the bill is bad and the evidence shows a good cause of action. The strict rule, imposing duty to set up all known facts in an answer, is not applied to bills, except in those instances in which an offer to amend comes after submission or decision. There the rule is somewhat strict, but this amendment was made before submission. The principal limitaton upon the right of a plaintiff to amend his bill in this state, before submission, is, that he shall not depart from the original cause of action or make a new case. That has not been done here. He may correct mistakes in his original bill by an amendment. *Burlew* v. *Quarrier,* 16 W. Va. 108; *Piercy* v. *Beckett,* 15 W. Va. 444; *Doonan* v. *Glynn,* 26 W. Va. 225; *Ratcliff* v. *Sommers,* 55 W. Va. 30. As to diligence, the degree required is in the discretion of the trial court, subject to review for abuse thereof. No abuse has occurred. While, as we have said, the amended bill is not essential to relief, no reason why the plaintiff should not be permitted to mature it, is perceived. Hence, this response to the objection to the filing thereof.

Perceiving no error in the decree, complained of, we affirm it.                                      *Affirmed.*