## APPEAL OF DURFEE MINERAL CO.

Docket No. 1133.    Promulgated June 9, 1927.

The terms of a trust agreement, together with a conveyance of property to the trustees named therein, *held* to have created such an association as is subject to corporation income and profits taxes under the Revenue Act of 1918.

*L. J. Benckenstein, Esq.*, for the petitioner.
*E. C. Lake, Esq.*, for the Commissioner.

This proceeding was initiated by an appeal made in the name of the former trustees of a trust estate created in June, 1919, and dissolved in February, 1920, from the determination of an alleged deficiency in income taxes for the year 1919 in the amount of $91,467.90. A deficiency was computed by the Commissioner under the provisions of section 219 of the Revenue Act of 1918, relating to trusts and trust estates. All the major facts concerning the creation, conduct, and dissolution of the estate were agreed to by stipulation of counsel. This was supplemented by oral testimony produced by the petitioner. At the hearing counsel for the Commissioner substantially abandoned the position previously taken in the deficiency letter and the Commissioner's answer, and argued that the Board find that the organization was a joint stock association and therefore taxable as a corporation under the Revenue Act of 1918.

FINDINGS OF FACT.

1. The trust estate involved in this appeal was formed by former tenants in common of an undivided interest in a certain 170 acre tract of oil and mineral land located in Wichita County, Tex. In the fall of 1918 oil was discovered in this district, which discovery caused one of the biggest oil booms in the history of the State of Texas. Prior to this time this parcel of land was practically worth- less—not worth a dollar per acre. In fact previous owners had let the property go for taxes. There was also a serious dispute as to the title, as the land lay in the old river bottom of the Red River and there was a question whether the land was in fact within the territorial limits of Texas or of Oklahoma or was a part of the United States public domain. The predecessors, from whom the parties here obtained title, derived their fee through a patent from the State of Texas. A conflict of interests between some of the tenants in common as to their respective interests also embarrassed the situation. The owners were scattered throughout Texas and other States. Upon the discovery of oil near this land there arose a demand for leases or purchase of this land. Owing to this chaotic condition of the ownership it was impossible to consummate any lease or sale. Recog- nizing the immediate necessity of a single agency with authority, the cotenants finally agreed on some trustees to act for them. On June 26, 1919, these trustees executed a declaration of trust as hereinafter set forth. Thereupon the cotenants deeded the land in question to the said trustees. The declaration of trust was as follows:

ARTICLES OF ASSOCIATION AND DECLARATION OF TRUST OF DURFEE MINERAL COMPANY

THE STATE OF TEXAS,
          County of Wichita.
KNOW ALL MEN BY THESE PRESENTS:

THAT this memorandum of agreement and declaration of trust, this the 26th day of June, A. D. 1919, made and entered into by and between W. D. Gordon. A. E. Borsum, K. C. Barkley, Geo. A. Smoot, and B. A. Cordell, all being resi- dents of the County of Wichita, in the State of Texas, duly elected, chosen and confirmed by all the subscribers to the shares of Durfee Mineral Company, a joint stock association, without personal liability on the part of its members, subscribers, shareholders or trustees, as the trustees of the said association, hereinafter called Trustees, WITNESSETH:

WHEREAS, it is proposed that the Trustees shall acquire certain property rights and money, and shall employ and manage the same in the manner here- inafter mentioned, and it is likewise proposed that the beneficial interest in the property from time to time held by the Trustees in the business and enterprise conducted by them shall be divided into shares to be evidenced by certificates of interest therefor as hereinafter provided.

Now THEREFORE, The Trustees aforesaid, whose election as such Trustees, the election of their successors or associates, and this Declaration of Trust,

shall be, and deemed to be ratified, confirmed and accepted by all the future shareholders in this Association by virtue of their acceptance of shares herein, now acting and speaking as well on behalf of their successors in this trust as in their own behalf, hereby declare that they will hold said property, rights and cash, so to be acquired by them as well as all other property which they may acquire as such Trustees, together with the proceeds thereof, in trust, and to manage and dispose of the same for the benefit of the holders from time to time of the certificates of shares issued and to be issued hereunder in the manner and subject to the stipulations herein contained, to wit:

FIRST: The Trustees, in their collective capacity shall be designated as far as practicable as DURFEE MINERAL COMPANY, and under that name, so far as practicable shall execute all instruments of writing in the performance of this trust, and conduct all business relative to the performance of this trust as hereinafter more fully stipulated.

SECOND: The Trustees shall be five in number, and may by resolution increase their number of elect additional Trustees from among the shareholders of the Association, which additional Trustees shall have the power and authority, and be protected by the same provisions and conditions as the original Trustees hereunder, and shall be deemed to be confirmed and accepted by the original and all future shareholders in the same manner as the original Trustees, and their successors, and upon the death or resignation or discontinuance of office of any Trustee, his successor shall succeed to the same rights and powers, and be subject to the same duties and liabilities and have the same compensation as his predecessor. The Board of Trustees so constituted shall remain in office until its successors are elected, and is a self perpetuating body, and in case of death, resignation or inability to act of any of said Trustees, the remaining Trustees shall have the power to accept any resignation, and fill any vacancy, even though they are less than a quorum. When any Trustee is elected by the remaining Trustees, the trust estate shall vest in the new Trustees, together with the continuing Trustees, without any further act or conveyance. Said Board of Trustees shall elect its officers and appoint such other officers of the Association and create such other offices as they may deem necessary in furthering the interests of this trust, and fix the salaries of all the officers of this organization. All investments and title to all property shall be made and held under the Declaration of Trust for and on behalf of this Association by the said Board of Trustees, all of whom shall act in the transfer, leasing, or mortgaging of property, or in appointing additional trustees, but a majority may act in attending to any other business, and the facts recited in such act of transfer, whether lease or deed, shall be conclusive. The Board of Trustees shall be Trustees for and on behalf of the Association, and may, in that capacity, sue and be sued in any court, and service of process may be had on the President, Secretary, or Treasurer. The Board of Trustees shall have the power and authority in conducting the business of the Association to borrow money, and mortgage property and to do anything to further the interests of this Association. The Board of Trustees shall draw up the By-Laws of this Association, which may be approved and adopted by a majority vote of said Trustees at any regular or called meeting, and any amendment may be made thereto, and to this Declaration of Trust, by the unanimous vote of the Trustees present, provided there is a quorum present. The Board of Trustees may from time to time declare and pay such dividends from the earnings of said Association as they may deem expedient.

THIRD: Until changed by the By-Laws of the Association, the head offices of the Association shall be located in the City of Wichita Falls, Wichita County, Texas.

FOURTH: The President shall preside at all meetings of the Board of Trustees, and shall sign all certificates of membership and do all acts which the Board of Trustees delegate to him.

The Secretary shall keep all minutes, books and records of the meetings of the Board of Trustees, and shall countersign all certificates of membership, attaching the seal of the organization thereto, and perform such other duties as the Board of Trustees may delegate to him.

FIFTH: If at any time the Board of Trustees shall deem it advisable to incorporate under the laws of the State of Texas, or of any other state, they may call a meeting of the shareholders and submit the same to them, and if consented to by a majority in interest of those present, or represented by written proxy, said Board of Trustees shall be authorized and may incorporate this Association.

SIXTH: The beneficial interest in this trust shall be divided into sixty one hundred and forty shares of stock, participating in the dividends of the association from time to time, and the holders of said stock having voting privileges in the management of the business affairs of the company. The above mentioned shares shall be of the par value of One Hundred Dollars each, which shall be fully paid and non-assessable; and as evidence of ownership of said shares, and each of them, the said Trustees shall cause to be issued to each shareholder a negotiable certificate in such form as the Trustees may adopt.

SEVENTH: This trust shall continue for the term of twenty one years after the death of the last surviving person elected as Trustee under this Declaration of Trust, by the shareholders at their meeting at the time of the organization of this association, unless incorporated or otherwise dissolved prior to this time, and at the end of such period of time, the Trustees may proceed to wind up its affairs, liquidate its assets and distribute the same among its shareholders.

EIGHTH: The Trustees shall hold the legal title to all property at any time belonging to this trust, as joint tenants, and not as tenants in common, in trust for the benefit of all the shareholders from time to time of the association, in proportion to the number of shares held by each and subject only the specific limitation herein and the By-Laws of the Association contained, and they shall have the absolute control, management and disposition thereof.

NINTH: The shareholders of the association shall have no legal right to the trust property whether real or personal, and the ownership of shares hereunder, shall not entitle the owner thereof to any title in or to any of the trust property or the right to call for a partition of the same, or to the dissolution of the trust, or accounting; but shares hereunder shall be personal property, giving only the rights in this instrument of writing, and in the certificates specially set forth, carrying only the rights to a division of the property at the termination of the trust hereby created, whether by the expiration of the period fixed for its existence, or from the dissolution of the association otherwise brought about for the division of the property of the trust.

TENTH: The death, insolvency or bankruptcy of any of the shareholders, the transfer of his or her interest by a sale, gift, devise, descent, or otherwise, during the continuance of this trust, shall not operate as a dissolution of this association, or termination of the trust, nor shall it have any effect upon the association, its operations or mode of business; nor shall it entitle his or her heirs, assigns, or representatives to an accounting or to take any action in any court, in law, or in equity, against the association, its members, its trustees, its officers, or its property or business operations which shall remain intact and undisturbed thereby, but they shall only succeed to the rights of the original

members or shareholders; that is, to the certificates of membership, and the share or shares it represents, subject to all the terms of this agreement, its amendments and by-laws of the association, now or hereafter adopted.

ELEVENTH: The Trustees shall be governed by this Declaration of Trust, its amendments and by-laws, now or hereafter adopted, but the said Trustees shall have and exercise all powers in such manner as they deem proper, except such as are specifically or by necessary implication, withheld by this Declaration of Trust, its Amendments and By-Laws.

TWELFTH: The Board of Trustees or any Trustee or the survivor of them, shall have no power to bind the shareholders personally, or the Trustees of any of them. In every written contract they shall enter into, relating to the business of the association, reference shall be made to this Declaration of Trust, and the person, firm, or corporation so contracting shall look only to the funds and the property of the association under said contract, and for the payment of any judgment or decree, debt, damages, or for the money that may become due and payable in anywise by reason thereof; and neither any trustee, nor any shareholder, present or future, shall be personally liable therefor, or any debts incurred, or engagements, or contracts made by the Board of Trustees, or any officer, agent, or servant acting under them for or on behalf of this association, or for any liability arising through contract, expressed or implied, or from tort, or in any way whatsoever.

THIRTEENTH: No Trustee hereunder shall be liable in any event for the act or omission of his co-trustees or any other person whomsoever, whether employed by such trustee, or not, nor for anything other than his own personal breach of trust.

FOURTEENTH: All letterheads, billheads and stationery whatever used by said Trustees, or by said association shall have printed thereon in a conspicuous place the following language:

"Durfee Mineral Company, a joint stock association, without personal liability in any event, of the Trustees, or any of the shareholders therein, in accordance with its Declaration of Trust recorded in Wichita County, Texas, of which all parties dealing with it must take notice."

FIFTEENTH: The funds and property of the association shall stand primarily charged with the burden of payment of any claim or money demanded, established or existing, on account of the operations and business of the association, whether founded on contract, expressed or implied, or on torts; it being distinctly understood, agreed and so declared that there shall be no personal liability in any event upon the Trustees, or any of them, or upon any shareholder hereunder.

SIXTEENTH: The Trustees are authorized to engage in the business of:

(a) Leasing and purchasing the right to prospect for oil, gas and other minerals, and buying and selling such rights.

(b) Prospecting for such minerals, and the drilling of wells and otherwise seeking to locate same.

(c) Acquiring the franchise for the laying of pipe lines and conduits for the transportation and merchandising of gas, petroleum, water and other minerals, and selling and supplying the same to corporations, municipalities, or individuals.

(d) Building and operating suitable tanks, pipe lines, and other suitable means of preservation, transportation and merchandising of gas, petroleum, water or other minerals.

(e) Producing, refining, and marketing gas, oil and other minerals and buying and selling the same.

(f) Manufacturing and selling gas, electricity, or other agents for lighting, heating, power or for any other purpose.

(g) Acquiring franchise for the transportation and merchandising of gas, electricity, or any other agencies for lighting, heating or power, or other purposes.

(h) Acquiring, owning, managing, exchanging, selling or dealing in stocks, shares and securities of other corporations, trusts, or associations, and of this association, engaged in whole or in part in the oil or gas business.

(i) Acquiring by purchase or otherwise, such property, real or personal, as said trustees deem necessary or proper for carrying on the business and purpose of this trust, and selling or leasing such property at their discretion.

(j) Conducting or engaging in any other business or undertaking or investment which the Trustees may deem advisable, and to the best interest of this association.

SEVENTEENTH : A majority of the Trustees shall constitute a quorum, and the concurrence of all the Trustees shall not be necessary to the validity of any action taken by them, except as herein otherwise specified in paragraph " Two," but the decision of those present and voting at any time being conclusive, as to ordinary business.

EIGHTEENTH : The officers of the association, until otherwise provided by the By-Laws shall be President, Vice President, Secretary, and Treasurer, all of whom shall be shareholders in this association.

NINETEENTH : All deeds, contracts, and other instruments in writing of whatsoever kind and character shall be signed by the President, of the association, and attested by the Secretary thereof, and the seal of the association impressed alongside the signature of the Secretary, and at the end of the instrument, and it is agreed and understood that such execution of all documents, deeds, leases, and any writing which the association may enter into is binding upon this association, the shareholders, trustees and officers thereof, and is the authorized method of executing all instruments of writing as aforesaid, relative to the business of the association, made in the manner set forth above, shall be binding upon the association, and upon them as trustees.

For the consummation of this agreement, and the formation and conduct of the affairs of this association, it shall not be necessary for all or any particular number of the shares to be sold; the trustees are hereby empowered to sell the shares of the Treasury stock of the association, as they may deem proper for furthering the interest of this trust. The unsold shares shall be considered as treasury stock until sold, and dividends shall be declared only upon the stock actually sold and issued.

IN TESTIMONY WHEREOF, the said W. D. Gordon, A. E. Borsum, K. C. Barkley, B. A. Cordell, and Geo. A. Smoot have hereunto set their hands in token of their acceptance, and of the assent of the Trust on behalf of themselves, and their successors, and each of them, in the selection of each of the others as Trustee, the day and year first above written.

(Signed)    W. D. GORDON,
AUG. E. BORSUM,
K. C. BARKLEY,
B. A. CORDELL,
GEO. A. SMOOT,
*Trustees.*

The deed of conveyance was as follows:

Geo. G. Clough.
Ethel B. Cordell et al.

                                                    Durfee Mineral Co.

THE STATE OF TEXAS
        *County of Wichita*
KNOW ALL MEN BY THESE PRESENTS:

That, whereas, Ethel E. Cordell joined herein by her husband, B. A. Cordell, of the County of Bexar, State of Texas, and Mrs. John T. Milliken, a feme sole, of the City and County of St. Louis, State of Mo., George G. Clough of Harris County, Texas, W. H. Walton of Lampasas County, Texas, Thos. B. Lewis of Harris County, Texas, R. L. Durham of Wichita County, Texas, W. M. Campbell of Jefferson County, Texas, G. F. Townsend of Tarrant County, Texas, George A. Smoot of Wichita County, Texas, K. C. Barkley of Harris County, Texas, P. J. Duffy of Harris County, Texas, Mrs. Forrest Moore, a feme sole, of Grayson County, Texas, Marrs McLean and W. D. Gordon, both of Jefferson Co., Tex., are tenants in common of undivided interest, the particular portion intersese being unnecessary herein to relate but which interests have been fixed and established in part by agreements among the parties hereto as among themselves, and such interests as are not fixed will later be determined by agreement or judgment, and being the fee simple owners as co-tenants of all hereinafter described land; and

Whereas, it is desired that their interest, estate, right and title in said land shall be conveyed to a joint stock association of which they, in proportion to their respective interest, are the beneficial holders and owners.

Now, therefore, in consideration of the sum of Ten ($10.00) Dollars and other good and valid consideration, and of the facts above recited, thereunto as moving, we the said Ethel E. Cordell, joined by her husband, B. A. Cordell, Mrs. John T. Milliken, a feme sole, Geo. G. Clough, K. C. Barkley, W. H. Walton, Thos. B. Lewis, R. L. Durham, W. M. Campbell, Marrs McLean, W. D. Gordon, G. F. Townsend, Geo. A. Smoot, P. J. Duffy, and Mrs. Forrest Moore, some of which are acting herein eo nomine, and others by and through their duly authorized agents and attorneys in fact, as hereinafter indicated, have this day granted, bargained, sold and conveyed, and by these presents do hereby grant, bargain, sell and convey unto the Durfee Mineral Company, a joint stock association, organized under the laws of the State of Texas, as manifested by Articles of Association of record in Wichita County, Texas, to which reference is made for greater certainty, the following described land, to wit:

        *       *       *       *       *       *       *

To have and to hold unto the said Durfee Mineral Company all of the above described premises, and to its successors and assigns forever;

It is understood, however, that neither individually nor collectively do the grantors in this instrument, by express terms or by implication, warrant the title to said land, except they do herein severally stipulate, as among themselves, that they have not heretofore sold or conveyed their respective interest; other than appears in the Deed Records of Wichita County, Texas, anteceding the making of this Deed.

It is further stipulated and understood that the said grantee, Durfee Mineral Company, assumes to discharge and carry out any and all obligations of whatsoever nature and kind now chargeable against said premises, in whole or in part, without recourse against any or all of the individual grantors herein.

It is further understood that the rights and interest now fixed as among the respectively grantors intersese shall be unaffected by this conveyance, and except that by this conveyance their respective interests shall be in the proportion of their stock ownership in said joint stock association, in like manner as the same at the making of this conveyance.

In Witness whereof, we have hereunto set our hands this 27th day of June, A. D. 1919.

[Signed]  GEO. G. CLOUGH,
ETHEL E. CORDELL,
THOMAS B. E. LEWIS,
W. H. WALTON,
By K. C. BARKLEY,
*Their attorney in Fact,*
W. D. GORDON,
By MARRS MCLEAN,
*His attorney in Fact,*
G. F. TOWNSEND,
Mrs. FORREST MOORE,
By J. B. MOORE,
*Her attorney in Fact,*
Mrs. JOHN T. MILLIKEN,
By B. A. CORDELL,
*Her attorney in Fact,*
MARRS MCLEAN,
B. A. CORDELL,
R. L. DURHAM,
P. J. DUFFY,
GEO. A. SMOOT,
K. C. BARKLEY,
W. M. CAMPBELL.

All of the trustees were beneficiaries with the exception of A. E. Borsum, secretary to W. D. Gordon, and who represented some of the other beneficiaries.

2. On the same date the trust was formed an agreement was made to lease the land to one T. H. Bass, by the terms of which all of the land of the trust, less $27\frac{2}{10}$ acres, was leased for $191,200. On July 16, 1919, the trust received on the lease $130,000 in cash and two notes, amply secured, in the sum of $30,000 and $31,200, respectively. A supplemental agreement was also made with the said Bass that the trust would retain $10,000 for litigation purposes to protect the title to the land leased.

On July 18, 1919, there was a joint meeting of the trustees and the beneficiaries, all of whom were either present in person, by proxy, or represented by attorneys authorized to act for them. The minutes of that meeting follow:

Meeting called by the Trustees of the Durfee Mineral Company, in response to Notices sent out to each of the Stockholders of the Durfee Mineral Company.
PRESENT: All the Trustees.
The following Stockholders were present in person or by proxy, to wit:
Mr. Geo. G. Clough.
Thos. B. Lewis.

J. B. Moore, representing Mrs. Forrest Moore.

P. J. Duffy.

Walton interests represented by K. C. Barkley and B. A. Cordell.

W. M. Campbell, represented by A. E. Borsum.

The first business was the reading of the Minutes of the last meeting. There being no objections, the Minutes were approved.

Upon motion made by K. C. Barkley and seconded by B. A. Cordell, the President and Secretary were authorized to execute the Supplemental Agreement from the Durfee Mineral Company to T. H. Bass, Trustee.

The motion was unanimously carried.

The President stated that the Lease which had been placed to the credit of the Durfee Mineral Company, in the City National Bank, Wichita Falls, Texas, subject to the Escrow Agreement, was on the 16th inst., delivered to the Lessee, and the transaction closed by the payment of the sum of One Hundred and Thirty Thousand ($130,000.00) Dollars, to the credit of the Durfee Mineral Company, and by the execution of Two Notes—One for Thirty Thousand ($30,000.00) Dollars, due in sixty days, endorsed by John H. Kirby and supported by One Hundred Thousand ($100,000.00) Dollars par value of the Capital Stock of the Kirby Lumber Company, and another note for Thirty One Thousand Two Hundred ($31,200.00) Dollars, due in ninety days, endorsed by John H. Kirby, and to which was attached One Hundred Thousand ($100,000.00) Dollars par value Kirby Lumber Company Stock as collateral with provisions as noted above; the Notes providing the usual form for realization on the collateral in case of default of the payment of the Notes. Both notes bearing 6% interest from the 16th day of July, 1919, and at the same time, on account of a misunderstanding about the rate of interest that these notes were to bear, the Company contending that the Notes were to bear 8%, but it then being too late to change these notes, which were made out and endorsed as 6% notes, a Supplemental obligation was taken on T. H. Bass, Trustee, for the additional 2% interest, amounting to Two Hundred and Fifty-Six ($256.00) Dollars, which obligation was taken by the Company in order that the original agreement as to the paper bearing 8% interest might become effectual. Thereupon the Leases in duplicate were signed by T. H. Bass, Trustee, and one copy delivered to him, and the Escrow Agreement ended at the bank.

A supplemental Agreement was also signed by the Durfee Mineral Company with T. H. Bass, Trustee, to the effect that the Durfee Mineral Company was to retain in its Treasury, at least Ten Thousand ($10,000.00) Dollars to assure expense money in any litigation which may involve the land leased, under the terms of the Warranty clause in the Contract; the Agreement being that the Durfee Mineral Company should pay the expenses, but not Attorney's fees which might be incurred by T. H. Bass, Trustee, or his associates in litigation with adverse claimants under Oklahoma or the United States, and in this Supplemental Agreement, a saving provision that the Warranty attached to the lease was understood not to be breached if the Title should be lost to any person or persons claiming under any other sovereignty other than the State of Texas.

Motion made by B. A. Cordell and seconded by Geo. A. Smoot, that the deal as outlined in statement of the president, and as concluded with Mr. T. H. Bass, Trustee, be approved.

Motion was unanimously carried.

Motion made by K. C. Barkley and seconded by B. A. Cordell that wherever the written claims made in conflict as to the ownership of the Stock, or any

part of it, develops, that the Trustees of the Durfee Mineral Company, through their officers, hold such Stock and such stock's proportionate part of the assets, as is embraced within the conflicting interests, in Escrow until the parties to the conflict either settle it by agreement or by suit.

Motion unanimously carried.

Motion made by K. C. Barkley and seconded by Geo. A. Smoot that after reserving the Ten Thousand ($10,000.00) Dollars provided in the Agreement with T. H. Bass, Trustee, the remainder of the money available shall be paid to the Stockholders as their interest appears.

Motion unanimously carried.

Motion made by K. C. Barkley and seconded by R. A. Cordell, that no commission be paid out of the proceeds of the sale of the lease, without the written consent of the Stockholders, or a decree of the Court enforcing such a demand.

Motion unanimously carried.

Motion made by K. C. Barkley and seconded by Geo. A. Smoot, that the Ten Thousand ($10,000.00) Dollars as provided in the Escrow Agreement be retained in cash and that the conflicting interest and the disputed commission be retained out of the Notes, and that the balance in cash on hand be paid out as dividends.

Motion unanimously carried.

Motion made by K. C. Barkley and seconded by Geo. A. Smoot, that each acre of the 200 acres of sand flats be valued at $2000.00 per acre, making a total of $400,000.00, and that the 26 acres in the 226 acre tract be valued at $4000.00 per acre, or a total of $104,000.00, and that the 27½ acres of high land be valued at $4000.00 per acre, or a total of $110,000.00, and that the stock be issued in the proportions in which the parties owning [own] these tracts based upon the above valuations.

Motion unanimously carried.

On October 11, 1919, the trust received money for the face value of the notes and $821.56 interest. A large portion of this sum was paid to those beneficiaries who had in the meantime settled among themselves their conflicting interests. The remaining balance was held to be distributed to the remaining interests still in dispute and for the expenses of the trust.

On November 1, 1919, the balance of the land (27–2/10 acres) was leased to the said T. H. Bass for $8,800 cash.

On December 31, 1919, the account of the trust stood as follows:

| | | |
|---|---:|---:|
| Total net income received | | $200,821.66 |
| Distribution made in cash to beneficiaries | $153,500.00 | |
| Office expenses | 1,195.73 | |
| General expenses | 2,441.72 | |
| Total expenses | | 157,137.45 |
| Undistributed cash on hand | | 33,684.21 |
| Legal expense fund | | 10,000.00 |

3. On January 3, 1920, it was decided by said trustees that it was necessary to be organized on a more permanent and satisfactory basis. There was a prospect of receiving royalties and there was

also impending important litigation over the title to the land in question. The land was not only claimed through title derived from the State of Texas, but was claimed by the State of Oklahoma and the United States Government. Furthermore, an opinion was entertained by the president and organizer of the taxpayer that it might be held by the Texas courts that joint stock associations were partnerships.

On February 2, 1920, the beneficiaries approved the acts of the trustees in forming a corporation; the trust estate was dissolved; its assets and liabilities were transferred to the Durfee Mineral Co.; a corporation was organized under the laws of the State of Delaware; and all the acts of the trustees were unanimously approved and the trustees discharged.

4. On March 13, 1920, the former trustees filed an income-tax return for the trust estate for the year 1919 showing income and expenses as set forth in paragraph 2 of these findings of fact. The return was made on a blank for corporation returns as no other blanks were available in Wichita County, Texas, at that time. Accompanying the return was a letter explaining the return, which letter was as follows:

MARCH 13, 1920.

Hon. A. S. WALKER,
   Internal Revenue Collector, Austin, Texas.

DEAR SIR: The enclosed report for the Durfee Mineral Company, a joint stock association, shows that this association was composed of the fee simple owners of the land which was put into the association as a means or method whereby it would be leased for operation as an oil property, and the bonuses and royalties conveniently distributed by one organization instead of by and through a dozen or more co-tenants. It is simply a case of investing the trustees with the power of administering the trust for the benefit of the owners. The report is therefore made by the organization as a trustee for the owners of the property and the names and amounts of each of these owners is shown in the statement of the tax, as well as the undistributed balance which the trustee organization holds.

I thought best to accompany this report with this letter of explanation.

      Very truly yours,
WDG/P                                        (Signed)      W. D. GORDON.

There was also sent a statement of the amounts paid to the different owners of the land held in trust. There is evidence that some, if not all, of the beneficiaries returned the income so distributed in their personal income-tax returns.

About three years later, to wit, March 2, 1923, the Commissioner proposed an assessment of tax in the sum of $78,273.75. The communication proposing the assessment was addressed to Durfee Mineral Co., and delivered to one W. D. Gordon, a former member of the trust estate who also was the former president and a member of the

board of trustees. The proposed assessment was protested by the former trustees, but the protest was overruled by the Commissioner, and on October 23, 1924, a deficiency was asserted in the sum of $91,467.90.

OPINION.

SMITH: The Commissioner's deficiency notice was based on his decision that the petitioner was taxable as a trust estate under the provisions of section 219 of the Revenue Act of 1918, and as far as the record discloses such was his opinion until the matter came to trial. At the hearing counsel for the Commissioner substantially abandoned the position previously taken in the deficiency letter and in the stipulations, and argued that the Board find that the organization was a joint stock association and therefore taxable as a corporation under the Revenue Act of 1918.

This procedure was objected to by counsel for the petitioner. The argument advanced by him at the hearing, however, was based on the theory that the organization was a common law trust and not an association, and he requested and secured permission to file a brief covering this point. Inasmuch as an interpretation of the provisions of the agreement of June 26, 1919, would be necessary in any event, and since the petitioner was not surprised by the change of front on the part of the Commissioner, we are constrained to entertain the issue which developed at the hearing, and which was the real point involved, namely, whether or not the taxpayer was an association that should be classified as a corporation for income-tax purposes. We do not apprehend that the position of the petitioner would be injured thereby, and the assumption by both the Commissioner and the petitioner throughout the early stages of the controversy that it was a trust, either taxable or nontaxable, was a mere conclusion of law not binding on this body.

The form of the organization under consideration is typical of those unincorporated associations commonly designated " Massachusetts Trusts." Such organizations have existed in Massachusetts for more than a century and for even a longer period in England, but the decisions of the Massachusetts courts are confusing and perhaps irreconcilable concerning the nature of these trusts. *Malley* v. *Howard*, 281 Fed. 363 (1922). The great mass of litigation that has arisen through the operations of these associations has resulted in their classification as (1) trusteeships, or (2) partnerships.

The origin of such division of these unincorporated associations may be traced to the celebrated English case of *Smith* v. *Anderson*, 15 Ch. D. 247 (1880). In that case the question of what constituted carrying on business arose and Lord Justice Brett said the shareholders " were joined together for the purpose of once for all invest-

ing certain money which was delivered into their hands, and not for the purpose of obtaining gain from a repetition of investments." The court also held that the shareholders did not transact the business of investing. "It was not their business" but was that of the trustees, who were "clearly trustees as distinguishable from agents and from directors." The organization was held a trusteeship on two points—(1) investment, and (2) lack of control by beneficiaries. This decision has been criticized in a few instances, but it is the law of England to-day. *Williams* v. *Milton*, 215 Mass. 1 (1912). It was not until 10 years after the decision in *Smith* v. *Anderson, supra*, that the courts of Massachusetts divided them into trusteeships and associations. *Mayo* v. *Moritz*, 151 Mass. 481 (1890). Litigation arising since that date has resulted in a number of decisions that are vague and conflicting as to how much or how little control by the shareholders is necessary to support a status as an association or as a trusteeship. Shareholders have little or no authority, practically, in any case, and it appears that the use of the control test, alone, is illogical and prolific of litigation and further confusion.

Cook on Corporations, in discussing Massachusetts trusts, states in Volume III, Eighth Edition, page 2251, et seq.:

What then are these Massachusetts trusts? In order to understand them it is necessary to divide them into two classes. First, where the trustees merely invest and collect dividends or interest or rental (from a single lease) and distribute the same among the shareholders. The supreme court holds that these are simple common-law trusteeships, the same as where a trustee under a will collects income and distributes it among the beneficiaries. The English authorities are to the same effect. Lord Halsbury says: "If . . . persons between whom no contractual relation exists subscribe to a fund to be invested in the shares of companies by trustees for the subscribers, the subscribers do not carry on a business, and probably the trustees . . . do not either." In this class of Massachusetts trusts the shareholders are not liable for the debts, and the trust is exempt from certain taxes.

Second, where the trustees carry on an active business for profit. These are simply unincorporated joint-stock associations.

These two lines of decisions probably mark the true line of distinction. Certainly those who carry on an active business for profit, through others, are principals and not mere beneficiaries, irrespective of how much or how little power of management and control they exercise, actually or by the terms of the original agreement. A silent participant in the profits of a business concern is liable for its debts, even though he take no part in its management.

The theory that these trusts should be divided according to whether the shareholders exercise great or little powers of control is only confusing. The trust instrument may be drawn either way. An *investment* trust agreement may give practically large powers to the shareholders, or a *business* trust agreement may give practically all powers to the trustees—a premium on irresponsibility. The real test is whether the shareholders or trustees or both combined carry on business; if so, they are a business trust, with liability for debts and taxes. Practically the courts apply this test now. A Massachusetts trust in active day by day mercantile or manufacturing or real estate business

is far removed from a trusteeship to cut coupons, or collect dividends, or a fixed rental and distribute the same, as under a will. The distinction based on shareholders' powers might well be abandoned. As a matter of fact, the shareholders exercise little actual control in any of these trusts, or in statutory joint-stock companies, or even in full corporation.

We shall now consider two cases, *Crocker* v. *Malley*, 249 U. S. 223, and *Hecht* v. *Malley*, 265 U. S. 144, which were relied upon both by the petitioner and the Commissioner to support their divergent claims.

In *Crocker* v. *Malley*, *supra*, the court had for consideration a case in which a Maine paper-manufacturing corporation with eight shareholders owned mills and certain real estate. It caused a Massachusetts corporation to be formed, and conveyed to it all of its mills but one, which, together with the real estate, were leased to it for a long term; receiving the stock of the Massachusetts corporation in return. The Maine corporation then transferred to the plaintiffs as trustees the fee of the property subject to lease, left the stock of the Massachusetts corporation in their hands, and was dissolved. The shareholders were the former stockholders of the Maine corporation. Written consent of a majority in interest of the shareholders was required for increasing the compensation of the trustees; for the filling of a vacancy among the trustees, and for a modification of the terms of the trust. In no other matter had the beneficiaries any control. The function of the trustees was not to manage the mills but simply to collect the rents and income of such property as might be in their hands, with a large discretion in applying funds to repairs and development of the property and in distributing what they determined to be fairly distributable net income among the beneficiaries.

The court held that the organization constituted a trusteeship on two grounds—(1) lack of control in the shareholders, and (2) no association among the shareholders—saying:

" The certificate holders * * * are in no way associated together, nor is there any provision in the [instrument] for any meeting to be held by them. The only act which (under the [declaration of] trust) they can do is to consent to an alteration . . . of the trust " and to the other matters that we have mentioned. * * * The question is whether a different view is required by the terms of the present act. As by D. above referred to trustees and associations acting in a fiduciary capacity have the exemption that individual stockholders have from taxation upon dividends of a corporation that itself pays an income tax, and as the plaintiffs undeniably are trustees, if they are to be subjected to a double liability the language of the statute must make the intention clear. * * *

If we assume that the words "no matter how created or organized " apply to " association " and not only to " insurance company," still it would be a wide departure from normal usage to call the beneficiaries here a joint-stock association when they are admitted not to be partners in any sense, and

when they have no joint action or interest and no control over the fund. On the other hand, the trustees by themselves cannot be a joint-stock association within the meaning of the act unless all trustees with discretionary powers are such, and the special provision for trustees in D. is to be made meaningless. We perceive no ground for grouping the two—beneficiaries and trustees—together, in order to turn them into an association, by uniting their contrasted functions and powers, although they are in no proper sense associated.

The pertinent facts in *Hecht* v. *Malley*, *supra*, were stated in the opinion as follows:

The Hecht Real Estate Trust was established by the members of the Hecht family upon real estate in Boston used for offices and business purposes, which they owned as tenants in common. It is primarily a family affair. The certificates have no par value; the shares being for one-thousandths of the beneficial interest. They are transferable; but must be offered to the trustees before being transferred to any person outside of the family. The trustees have full and complete powers of management; but no power to create any liability against the certificate holders. There are no meetings of certificate holders; but they may, by written instrument, increase the number of trustees, remove a trustee, appoint a new trustee if there be none remaining, modify the declaration of trust in any particular, terminate the trust, or give the trustees any instructions thereunder.

The Haymarket Trust is strictly a business enterprise. It was established by the original subscribers who furnished the money for the purchase of a building in Boston used for store and office purposes. The shares are of the par value of $100 each. Except as otherwise restricted, the trustees have general and exclusive powers of management, but no power to bind the certificate holders personally. At any annual or special meeting of the certificate holders, they may fill any vacancies in the number of trustees, depose any or all the trustees and elect others in their place, authorize the sale of the property or any part thereof, and alter or amend the agreement of trust.

The court held that the organization was an association within the meaning of the Revenue Act of 1918. In reaching this conclusion it considered the case from two standpoints—(1) control, and (2) doing business—and based its opinion primarily upon the latter, saying:

We conclude, therefore, that when the nature of the three trusts here involved is considered, as the petitioners are not merely trustees for collecting funds and paying them over, but are associated together in much the same manner as the directors in a corporation *for the purpose of carrying on business* enterprises, the trusts are to be deemed associations within the meaning of the Act of 1918; *this being true independently of the large measure of control exercised by the beneficiaries* * * *. We do not believe that it was intended that organizations of this character—described as "associations" by the Massachusetts statutes and subject to duties and liabilities as such—should be exempt from the excise tax on the privilege of carrying on their business *merely because such a slight measure of control may be vested in the beneficiaries* * * *. (Italics ours.)

The trustees of the Hecht Trust insisted that it was not an "association" within the meaning of the Revenue Act of 1918, and relied upon the decision in the *Crocker* case, which involved a determination as to the form of organization of the Wachusett Realty Trust,

as conclusively determining that it should be judged by the single test of control vested in the shareholders. To this reasoning the court would not assent and stated that in that case—

The precise question was whether the trustees of The Wachusett Realty Trust were subject to the income tax upon dividends received from a Massachusetts corporation that was itself taxable upon its net income.

The court said further that its opinion in the *Crocker* case was:

* * * Based primarily upon the view that the Income Tax Act, considering its purpose, did not show a clear intention to impose upon the trustees as an "association" a double liability in reference to the dividends on stock in the corporation that itself paid an income tax, when considered as "trustees" they were by another provision of the Act exempt from such payment. And the language used *arguendo* in reaching this conclusion that the trustees could not be deemed an association unless all trustees with discretionary powers are such, and that there was no ground for grouping together the beneficiaries and trustees in order to turn them into an association—is to be read in the light of the trust agreement there involved, under which the trustees were, in substance, merely holding property for the collection of the income and its distribution among the beneficiaries, and were not engaged, either by themselves or in connection with the beneficiaries, in the carrying on of any business. *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, 190. And see *Smith* v. *Anderson*, L. R., 15 Ch. Div. 247.

It results that *Crocker* v. *Malley* is not an authority for the broad proposition that under an Act imposing an excise tax upon the privilege of carrying on a business, a Massachusetts Trust engaged in the carrying on of business in a quasi-corporate form, in which the trustees have similar or greater powers than the directors in a corporation, is not an "association" within the meaning of its provisions.

The measure of control reserved to the shareholders was not considered as a test by the Supreme Court in its determination of *Burk-Waggoner Oil Assn.* v. *Hopkins*, 269 U. S. 110, the question presented being whether or not an unincorporated association which was technically a partnership in Texas, the State in which it was organized, should be deemed to be a partnership or a corporation for income-tax purposes under the Revenue Act of 1918. In holding the plaintiff to be taxable as a corporation the court based its decision on the ground that the power of Congress to tax joint-stock associations and to "determine how and at what rate the income of the joint enterprise shall be taxed," is "not affected by the fact that, under the law of a particular State, the association cannot hold title to property, or that its shareholders are individually liable for the association's debts, or that it is not recognized as a legal entity."

The reasons for, and the circumstances surrounding, the creation of the present petitioner can best be obtained from the following testimony of W. D. Gordon, who said:

I live at Beaumont, and I had some clients who had a claim, or ownership of some land right in the river bed of Red River, and adjacent to some older patent surveys.

The land up to the discovery of oil in that immediate territory was considered so worthless that the owners, to whom patents had been issued by the State of Texas, the immediate predecessors in interest of my clients, and other persons, other parties cotenants with them, had paid no taxes on them.

They could not be used for any beneficial purpose.

The discovery of oil near this land, however, in what is known as the Burke Burnett Oil field, provided a great oil boom in that section of the State, and there were other lawyers representing other branches of this title up there endeavoring to do something with this land.

There was some minor conflict between the interests represented by the other lawyers, and myself, all holding on to this patent that the State had issued to a man named Walton, and finally I was induced to go to Wichita in an effort to work out a solution of the difference between the cotenants and also to put the property in such condition as that the owners could lease it. At the time I got there there had been numbers of offers made for leases on this land by prospective oil operators, and before a lease could get out and be signed by all of the different cotenants, some of whom were in St. Louis, some in San Antonio, Tex., some in Lampasas, some in Houston, some in Beaumont, some in other sections, some in Dallas, before the lease could get around to be signed up the man who had made the proposition had gone on after something else, because he could not wait.

The boom condition of things was such that immediate action had to be had or you could not make a trade, could not close a trade with anybody.

That was the situation when I got to Wichita Falls. I immediately saw there must be an agency created with power to handle this property, that the individuals could not, in the very nature of things, make any trade for the leasing or development of their property at all in the situation in which it was thrown.

Even if it were not for the conflicting claims among certain of the cotenants, that had to be first adjusted, they could not close any trade, so I suggested to the cotenants, some of whom were there present, and all represented there by attorneys, that an agency would have to be organized, would have to be created to act as a conduit through which the property could be handled without reference to the individuals themselves.

I first thought of organizing a corporation, and that was too slow, so I took up an old trust form that they were using up there, that some of the lawyers had prepared, a form of a trust or an association.

From this, I dictated a document, using the general terms of it and making it directly applicable to the particular nature that was under consideration. I organized a trust. That document is in evidence here. I did that by getting all of the interested parties, all who were parties at interest, or interested in this land, or their attorneys, and the attorneys representing the parties at interest together and making ourselves trustees for the benefit of the others, and giving ourselves as ample power as I know how to put in there for the purposes which we had in view.

The instrument of June 26, 1919, creating the petitioner is entitled "Articles of Association and Declaration of Trust of Durfee Mineral Company," and throughout that instrument the organization is constantly referred to as an " association " or a " joint stock association." Paragraph " SECOND " in the declaration outlines the powers of the trustees. Among other things they were empowered to fill vacancies

108346°—28——19

occurring on the Board of Trustees, select and appoint proper officers of the association, conduct the business of the association, draw up and approve by-laws of the association and amend such by-laws and the .declaration of trust. "Voting privileges in the management of the business affairs of the company" were delegated to the shareholders in paragraph "SIXTH" in the declaration of trust.

The declaration further provided:

For the consummation of this agreement, and the formation and conduct of the affairs of this association, it shall not be necessary for all or any particular number of the shares to be sold; the trustees are hereby empowered to sell the shares of the Treasury stock of the association, as they may deem proper for furthering the interest of this trust. The unsold shares shall be considered as Treasury stock until sold, and dividends shall be declared only upon the stock actually sold and issued.

The deed of conveyance of the property by the tenants in common to the Durfee Mineral Co., dated June 27, 1919, however, provided:

It is further understood that the rights and interest now fixed as among the respective grantors *inter sese* shall be unaffected by this conveyance and except that by this conveyance their respective interests shall be in the proportion of their stock ownership in said joint stock association, in like manner as the same at the making of this conveyance.

The form of organization chosen by the petitioner to carry out its purposes was complex and cumbersome, and although the articles of association purported to authorize the trustees to have complete control of the management of the property and the distribution of dividends arising therefrom, it is apparent from the action of the trustees in calling a shareholders' meeting to approve the lease with T. H. Bass, and the leaving of such problems as the determination of the value of the property and the value of the conflicting interests therein to the shareholders for solution, that it was understood by all parties interested, either as trustees or shareholders, that the shareholders should have an active interest in the management of the business. The circumstances surrounding the formation of petitioner and the acts of the trustees and shareholders subsequent thereto indicate that both organizers and shareholders had in mind no more than the delegation of partial authority to a group of agents denominated "Trustees."

There can not be much doubt that the petitioner was engaged in doing business irrespective of the fact that as far as the record discloses the trustees did only one act, viz., the leasing of the property. The articles of association provided for the carrying on of a general oil, gas, and mineral production and marketing business in addition to the selling or leasing of the land and it is immaterial that the

trustees in their discretion did not engage in all of the activities they were authorized to do. *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, and *Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, differentiating business and holding corporations.

The courts of the State of Texas, the jurisdiction in which the petitioner was organized, have often been called upon to decide whether organizations similar to the one under consideration here were in fact associations constituting trusteeships or partnerships, and a recent decision, after reviewing the Texas authorities and previous decisions in point, has held that associations organized for profit were partnerships irrespective of the element of control. *Thompson* v. *Schmitt*, 115 Tex. 53; 274 S. W. 554, cited with favor by the United States Supreme Court in *Burk-Waggoner Oil Assn.* v. *Hopkins, supra.* The court was asked "Does the declaration of trust * * * constitute a joint-stock association," and its reply was "Yes," and the doubts expressed at the hearing by W. D. Gordon, president and organizer of the petitioner, that it would be considered a joint-stock association by the Texas courts were well founded and that under the Texas rule it was at all times a joint-stock association prior to its incorporation in 1920.

The Revenue Act of 1918 defines corporations as including "associations, joint-stock companies and insurance companies," and the Supreme Court has held that Congress intended in the Revenue Act of 1918 to extend its application to associations or joint-stock companies whether organized under statutory authority or not, and irrespective of whether they may be considered partnerships as regards the liability of shareholders for debts to third parties. *Hecht* v. *Malley, supra. Burk-Waggoner Oil Assn.* v. *Hopkins, supra.*

It seems clear that the articles of association and declaration of trust of the petitioner when considered together with the reasons for and the circumstances surrounding its execution did not clearly set out and define the respective rights, duties and privileges of the trustees and shareholders; that it was engaged in doing business; that it would in all probability be considered by the Texas courts as a partnership with respect to its shareholders' liability for debts to a third party; that as such partnership it would be properly taxable as a corporation under the Revenue Act of 1918; that the better rule and the one used by the courts to-day in classifying such an organization either as a trusteeship or a partnership is the double test of (1) control, and (2) doing business, especially the latter, and that applying such double test would result in confining trusteeships to those declarations of trust where there is no control in the shareholders and the trust is not engaged in doing business.

We are, therefore, of the opinion that the petitioner was, during the year 1919, an association engaged in doing business and should be classified as a corporation for income-tax purposes under the Revenue Act of 1918.

> *Judgment will be entered for the Commissioner on 15 days' notice, under Rule 50.*

ARUNDELL and TRUSSELL dissent.

MILLIKEN not participating.