234 CASES IN CHANCERY, 1916–1917.

General Invest. Co. *v.* Bethlehem Steel Corp.  87 *N. J. Eq.*

GENERAL INVESTMENT COMPANY

*v.*

BETHLEHEM STEEL CORPORATION.

[Decided March 6th, 1917.]

1. The court will take judicial notice of unsettled condition of public affairs when war is imminent, in dealing with underwriting contracts involving large amounts of money.

2. Assuming that the court must consider the equitable and legal rights of a complainant stockholder, even if he bought his stock solely to acquire a status to question a corporate transaction, before a court of equity will act it must be demonstrated that complainant's right is clear, his injury irreparable, and his remedy at law inadequate.

3. The issuance of non-voting stock is not prohibited as against public policy.

4. Participation of directors of a corporation in a syndicate to take up such stock does not make the actual transaction void. The contract is voidable but open to ratification by the stockholders.

5. Under the statutes of this state common stock may be divided into classes, and the voting privilege may be withheld from any class.

6. The mere fact that it is the purpose of stockholders in withholding voting power from a new issue of common stock, to perpetuate the management, is no objection, in the absence of bad faith, to the issue.

7. Common stock defined.

On bill, &c.

*Messrs. McCarter & English* (*Mr. Egner* and *Mr. McCarter*), for the complainant.

*Messrs. Lindabury, Depue & Faulks* (*Mr. Faulks, Mr. Hardin, Mr. Lindabury*), with whom was *Mr. Paul D. Cravath* (of the New York bar), for the defendant.

LANE, V. C. (orally at conclusion of argument on motion for temporary injunction).

This is an application for a temporary injunction to restrain Bethlehem Steel Corporation from increasing its capital stock.

The present capital stock is $30,000,000, divided one-half preferred and the other common, with equal voting rights. The plan is to increase the capital stock by $45,000,000, the additional to be called common, class B. Of this $30,000,000 is to be put out as a stock dividend; $15,000,000 is to be sold. The stock is to have all the characteristics of common except that it will have no vote. The surplus of the company amounts to something like $69,000,000, and the scheme is proposed so as to get a part of this surplus out into the hands of stockholders and yet leave the money with the company as working capital. The intent of those who formulated the plan was to keep control of the company in its present stockholders. It is said that there is a good business reason for so doing. As part of the transaction a contract was entered into by the company under which Seligman & Company, bankers, agreed to form a syndicate to underwrite the issue of $15,000,000 of the new stock. They were to be paid a certain commission, amounting, in case the plan was unsuccessful, I think, to $225,000, and, in case it was successful, to $450,000. A portion of this commission was to be retained by Seligman & Company, and the remainder to be paid to those who should become syndicate subscribers. Among the syndicate subscribers were certain directors of the company, including Mr. Schwab. The plan was promulgated January 25th, 1917, and immediately became public. The bill is brought by the General Investment Company, a corporation dominated and controlled by Clarence H. Venner. He bought his stock—one hundred shares—January 31st, 1917, and immediately notified the company of opposition to the plan. He filed his bill on February 9th. The meeting of stockholders called for the purpose of acting on the increase was scheduled to be held February 14th. The last day for stockholders to subscribe under the syndicate agreement is March 8th. The contract between the company and the bankers provided for a limited time of performance. It is represented, and the court will take judicial notice of the fact, that in the present unsettled condition of affairs, contracts of this nature, dealing with the sums here dealt with, must be entered into with a very limited time provided for performance, nothing else is conceivable.

236 CASES IN CHANCERY, 1916–1917.

General Invest. Co. *v.* Bethlehem Steel Corp. *87 N. J. Eq.*

On the day fixed the meeting was held. There was voted in favor of the plan one hundred and twenty-six thousand three hundred and seventy shares of preferred, and one hundred and twelve thousand one hundred and fifty-six shares of common, stock, and against the plan, four hundred and fifty shares of preferred, and one hundred and twenty-five shares of common, stock, of which latter one hundred shares were those held by the complainant.

There is another common stockholder holding twenty-five shares who, after argument by complainant's counsel, to-day seeks to intervene. In view of my conclusions, I shall deny her application. The situation, therefore, is that over ninety-nine per cent. of the present stock desire that the plan should go forward, and opposition is made by only one hundred and twenty-five shares. Of these one hundred were actually bought after the promulgation of the plan, and, I think, for the sole purpose of bringing this suit, notwithstanding the denial of Mr. Venner. The law seems to be settled that even under these circumstances this court must consider any equitable or legal right which the complainant may have cognizable or enforceable only in a court of equity. *Hodge* v. *United States Steel Corporation, 64 N. J. Eq. 111.* The reason of the rule, I assume, is, as applied to stock, that to hold otherwise would be to impose a restraint upon alienation. A holder of stock before the threatened act must be able to transfer all of his rights to anyone or the value of the stock may be affected. Notwithstanding this rule, before this court will intervene, at the suit of a stockholder who buys in under the conditions present here, a very small amount of stock, to prevent the carrying out of a plan such as this, approved by practically the entire stock issued, it must be satisfied that the right of the complainant is clear and the injury irreparable. Vice-Chancellor Pitney in *Trimble* v. *American Sugar Refining Co.. 61 N. J. Eq. 340* (at *p. 345*). The attack made upon the plan I will consider, putting out of mind, as far as I can, the circumstances under which it comes here.

Complainant asserts, firstly, that the corporation has no power to issue a class of common stock, or a class of stock having all the characteristics of common stock, without the voting privilege;

secondly, that because it is admitted that the purpose is to perpetuate the present control of the corporation, and because some of the directors who voted in favor of it became syndicate subscribers, and therefore will profit by its success, the entire proceedings are void.

1. Whether the corporation has the legal power to issue this class of stock depends upon the construction to be put upon the eighteenth section of the Corporation act. Revision of 1896, *Comp. Stat. p. 1608.* From a casual reading of that section it would seem that stock of any kind, nature or description, common or preferred, or whatever it may be called, may be created with or without voting privileges. Counsel for complainant insists that the section must be construed in the light of a public policy said to have prevailed at the time the section was adopted and to prevail now, *i. e.,* that common stockholders, at least, are entitled to consultation with, and advice of, and action by every other common stockholder, and that the policy of the law required that a corporation should be managed by a majority of its stock. In other words, the privilege of voting is necessarily incidental to common stock. The cases relied on are *Cone* v. *Russell & Mason, 48 N. J. Eq. 208; White* v. *Thomas Inflatable Tire Co., 52 N. J. Eq. 178;* but see *Chapman* v. *Bates, 61 N. J. Eq. 658* (at *p. 667*).

The question is not, however, whether after a person has purchased stock in a corporation having a certain amount of stock vested with the right to vote, these fellow-stockholders may voluntarily separate the right of property from the right to vote, and thus put the control of the corporation in the hands of those having no pecuniary interest therein and deprive the dissenting stockholder of the advice and action of those whose advice and action he may have fairly be said to have contracted for, but rather whether such stockholder is entitled to require that any new stock issued should be vested with the privilege of voting, a very different proposition. I have examined, in the short time I have had, all the cases that I could locate and I have failed to find any statement of such public policy, with, possibly, the exception of a remark made by Judge Lurton in *Hamlin* v. *Toledo, St. Louis Railroad (C. C. A.), 78 Fed. Rep. 664,* in

which, while sustaining an issue of preferred stock, or, rather, an issue of stock which was neither preferred or common, a rather peculiar kind of stock, as he called it, he said: "They surrendered the privilege of voting. That was, perhaps, a valid agreement between stockholders, though of doubtful public policy."

It is almost impossible to get a definition of common stock or a statement of what classes of stock may be issued, and the necessary rights and privileges of the classes, that is satisfactory. Thompson, section 3426, in referring to common stock, says that the name itself indicates its nature, and it is so called because it is the common stock, or the stock which private corporations generally issue; and is usually the only kind authorized. He says the universal rule is that the owners of common stock are entitled to a *pro rata* dividend of profits, and to a *pro rata* participation in the management of the corporation; that the holders of common stock sometimes have a preference in the management of the corporation. In section 3425, with reference to classes of stock, he states:

"The first general division of stock is into common or preferred stock; and these two classes are again subdivided into almost an infinite variety."

Section 859:

"The rule that a right to vote follows the ownership of stock means only that in the absence of any common restriction upon all the stock, or upon a class of stock, this right prevails. That is, the right of a stockholder to vote cannot be arbitrarily abridged and is not subject to universal restriction. But the rule is equally emphatic, if not so general, that restrictions may be placed upon the right to vote; or, as sometimes stated, the right to vote may be separated from the ownership of stock. It must be remembered, in this connection, that stockholders can make any agreement respecting their stock, or the voting of it, that they may see fit or deem wise, except agreements that are void as against public policy."

He cites *Miller* v. *Ratterman* (*Supreme Court of Ohio*), *24 N. E. Rep. 496*. There the question was as to whether preferred stock might be issued without voting privileges. The court said: "It is true that one characteristic of stock, generally,

is that it can be voted upon. But this not essential. Indeed, instances may arise where it is good policy to prohibit the voting upon stock," citing cases. Thompson, section 859, contains the statement:

"So, it has been established that holders of preferred stock may be denied the right to vote the same at any meeting of the holders of the capital stock of the corporation. The legality of such restriction is not based on the theory that preferred stockholders are guaranteed a dividend; but rather on the inherent power of the corporation to restrict the voting power. It is simply a contract relation between two classes of stockholders, in which the public has no concern."

He instances a great number of cases where restrictions with respect to voting has been imposed upon common stock, *i. e.,* one stockholder should not vote more than a fourth of the total, a stockholder should not vote more than one hundred shares, nonresidents should not vote, purchasers of forfeited stock should not vote, even though not liable for the amount due until the amount due was paid.

"There is no rule of public policy which forbids a corporation and its stockholders from making any contract they please in regard to restrictions on the voting power." *Cook Corp.* § *622b.*

"Inasmuch as preferred stockholders are members of the company, and except in so far as their rights may be altered by the contract, statute or by-law under which the shares are issued, entitled in all respects to the same rights as other shareholders, it follows that they have the same voting rights as other shareholders. The right of shareholders to vote is, however, like the right to dividends or to participate equally in a division of capital on liquidation regarded as a private matter for each shareholder which he may waive if he choose. Consequently, a provision that shareholders of a certain class shall have no right to vote is, if assented to by them, quite valid. Such a provision might theoretically be made as to either the preferred or the deferred (Machen calls common deferred shares), but it is much more common with respect to the preferred shares so as to compensate the other shareholders for the preference of the preferred stockholders as to dividends." *Mach.* § *570.*

"A stockholder has no right to vote at corporate meetings, whether the stock is common or preferred, if it is so stipulated when the stock is issued, for the stipulation is then a term of his contract." *3 Cl. & M. 1996.*

*Mackintosh et al* v. *Flint P. M. R. Co., 32 Fed. Rep. 350; 34 Fed. Rep. 582,* is referred to in Clark & Marshall as authority for the proposition that preferred stock may be given the exclu-

240          CASES IN CHANCERY, 1916–1917.

General·Invest. Co. *v.* Bethlehem Steel Corp.     *87 N. J. Eq.*

sive privilege of voting, at least in that case for a time. Counsel have not referred me to any case enunciating a public policy which would require that all common stockholders should have the voting privilege. In this state ·it has been held that the matter is purely one of contract. *McGregor* v. *Home Insurance Co. of N. J., 33 N. J. Eq. 181; In re Newark Library Association, 64 N. J. Law 218.* This seems to be the rule in the other states.

Section 13 of the Delaware Corporation act is or was precisely similar to our section 18. The construction of that statute came before the supreme court of Delaware in *State* v. *Brooks, 74 Atl. Rep. 37.* Preferred stock had been issued without the right to vote. There was a constitutional provision providing that all stock issued should have voting privileges. It was contended that the issuance of the preferred stock was in violation of this provision. The court held not, and that the constitution meant that stock should vote which by law had a vote; that there was no public policy which prevented the issuance of stock without the voting privilege. The reasoning of the court is as applicable to common as to preferred stock, assuming that the relation between the stockholders is purely one of contract. The case was reversed in the court of errors and appeals *(79 Atl. Rep. 790),* but upon the ground that the constitutional provision meant what is said, and that the statute was in violation of the provision. The constitutional provision had been repealed before the decision, and the court points out that there is a distinction between the situation in New Jersey and in Delaware, *i. e.,* the absence in New Jersey of any such constitutional provision. Turning to the statute:

."Every corporation organized under this act shall have power to create two or more kinds of stock, of such classes, with such designations, preferences and voting powers or restrictions or qualifications thereof as shall be stated and expressed in the certificate of incorporation or in any certificate of amendment thereof."

No broader language could have been used, and unless the usual meaning of these words is to be·restricted by reason of the existence of some public policy, it is inconceivable to·me that

a corporation may not issue this class of common stock, or call it what you will. I have failed to find the existence of any such public policy. The matter is one for the stockholders to determine by their contract. If the public does not want to buy it does not have to. The legal rights of the present stockohldors are not affected; they contracted at the time they went in that they would have the advice, consultation with and action by (or rather the opportunity of securing such advice, consultation and action) of the then existing stock (and this subject to its reduction in accordance with law), but there was no contract that the corporation would, if it created further stock, give that further stock the voting privilege, so that the present stockholders might have the opportunity of securing advice by and consultation with and action by the new stockholders. I think that the reasoning of the cases, of which *Cone* v. *Russell & Mason, supra,* is one, does not apply in the case of an issue of a new class of stock. Section 18 has received the consideration of the court of errors and appeals in *Lloyd* v. *Pennsylvania Electric Vehicle Co., 75 N. J. Eq. 263,* Mr. Justice Swayze delivering the opinion of the court. In view of that case it is hardly necessary to consider in detail the various statutes preceding the Incorporation act of 1896. The court holds that the legislation is new and must be so construed, and, referring to section 86, defining the rights of certain class of preferred stock, said: "That section is a survival of legislation going back to the early days of corporations in this state, at a time when only one class of preferred stockholders was authorized. Such is not now the case. Under the present act it is possible, for example, to issue what are called sometimes 'founders' shares,' unless the rights of such shares are determined by the certificate of incorporation, they cannot be determined by the provision of section 86, and the same reasoning is applicable to other classes of shares (aside from the ordinary preferred shares) which are issued by modern corporations."

If a corporation may issue what are commonly called "founders' shares," I can hardly see how it can be said that it cannot issue a class of stock called common, class B, without voting power. As I presently view it, this new stock is common. I do

242 CASES IN CHANCERY, 1916–1917.

General Invest. Co. v. Bethlehem Steel Corp.    87 N. J. Eq.

not agree with Mr. Hardin that the effect of this plan is to make the present common a class of preferred stock. I think that it is one of the subdivisions of the common. The essential elements of common stock are that the holders have an opportunity to make profit, if there is any, and participate in the assets after all other claims are paid, and bear the loss if there be such.

"By common stock is meant that stock which entitled the owners of it to an equal *pro rata* division of profits, if any there be; one stockholder, or class of stockholders, having no advantage, priority or preference over any other shareholder or class of stockholders in the division." *Cook § 12 p. 62.*

I think he refers to material advantages, priorities and preferences, and not to such privilege as the right to vote. See, also, *Elkins* v. *Camden and Atlantic Railroad Co., 36 N. J. Eq. 233* (at *p. 237*). When there is found stock which answers so far as material interest in the property is concerned these conditions —this is the common stock. The legislature has provided that this common stock may be divided into any number of classes. The only distinction which I can think of must be in relation to voting rights. There may be class A voting stock, with full voting power; class B, allowing each share one-half a vote, and so on.

The bar, generally, I think, has put the construction that I have put on this section. There was introduced in evidence some fifteen or more charters, some of very large corporations, providing for classes of common stock with and without voting power, and one or more with the preferred stock having the exclusive voting power. The conclusion I have reached is that the corporation may issue this peculiar class of stock.

2. *a.* That the purpose of the plan is to retain control in the present stockholders does not vitiate it. The question is one of good faith. There is no charge of bad faith in the present case. In *Warren* v. *Pim, 66 N. J. Eq. 353* (at *p. 408*), Mr. Justice Swayze, dissenting, said (referring to the voting trust): "If the only object of the voting trust is to secure permanency of management, with a view to what the stockholder honestly considers to be the best interest of the corporation, I see no objec-

tion to the adoption of any necessary means authorized by the statute to secure that end. * * * But can it be contended that, if a corporation finds it necessary to borrow money upon bonds issued for a long term of years, the stockholders cannot, consistently with public policy, in order to secure the loan, vest the management of the corporation in hands satisfactory to the lenders and for a term commensurate with the loan?" The opinion, though a dissenting one, secured the vote of five other judges. The case was decided by a vote of seven to six upon another point. Only two judges took a diametrically opposite view. The opinion, therefore, is entitled to great weight.

There are many cases in other states not necessary to cite holding that it is within the power of stockholders to combine for the purpose of maintaining a management in control, and if done in good faith, there is no legal objection to it. The mere fact that one of the results of the plan may be to perpetuate the control in the hands of its present stockholders does not vitiate the plan. The stockholders were entitled to vote as their selfish interests dictated.

*b.* Some of the directors who voted for the plan to amend the certificate of incorporation became syndicate subscribers. There is no evidence that they were subscribers before they voted. It is insisted by reason of their participation the entire transaction is void. I have found that there was no fraud (none is charged) and that the directors were in nowise (and could not have been) influenced by the fact that they were going to participate in this underwriting agreement. When they became subscribers they did so for the benefit of the company. But four out of the eleven directors became parties. It is said, however, that the court must find under the rule enunciated by the court of errors and appeals, in *Steel Corporation* v. *Hodge, 64 N. J. Eq. 807,* not only that the syndicate contract falls, but that the entire transaction is absolutely vitiated. I am not going to at this time pass upon whether or not this contract can be set aside in the present proceeding or whether the corporation can be restrained from paying out moneys under it, or whether the syndicate subscribers may be compelled to return to the corporation the moneys they may receive by virtue of it. No application for such

relief is made. Complete justice may be done, so far as this branch of the case is concerned, without preventing the consummation of this plan. The contract is not void, but voidable, and may be ratified by the vote of the stockholders, and there is no evidence before me that full disclosure was not made at the meeting of February 14th, at which time the stockholders approved the plan. I do not think that the complainant under the circumstances may now insist that this entire transaction should be set aside because of the rule of law which he invokes, at least upon this preliminary application.

3. The stock was purchased by the complainant upon the 31st of January. The bill was not filed until the 8th of February. The complainant knew that the meeting was to be held on the 14th, and he also knew that the effect of bringing this suit on the eve of the meeting would be to create great disturbance in the company's affairs. It has been held, and I think ought to be the rule, that although the right of a complainant to bring a suit such as this cannot be affected by the fact that he bought in after the plan was promulgated, and for the purpose of bringing suit, yet to succeed at least on preliminary application he must move with the utmost speed. The length of time which will constitute such laches as to prevent preliminary relief depends upon each particular case. No excuse is given for the delay of nine days. *Quære.* Whether there was not such delay here as to warrant the court in denying temporary relief.

4. Under the opinion of the Delaware court (*State* v. *Brooks, supra;* 79 *Atl. Rep.* 790), it would seem to follow that if this stock is issued, and I am wrong in my conclusion that it may be issued without voting power, the only effect will be that the contract which is expressed by the certificate of amendment is void, and the stock will, in fact, have the voting power. There is no question raised but that the corporation may properly increase its capital stock to the extent of $45,000,000, so, that if the only effect is that the stock will in fact have the voting power when everybody thinks now it has not, is any harm done? Is there any irreparable injury which will warrant the award of temporary restraint? The right of the holder of these one hundred shares to his dividend cannot be affected by these proceedings. It may

be that stockholders cannot be forced to take this stock in lieu of dividends, but that is not a matter for present consideration.

5. In *Fielden* v. *Lancashire and Yorkshire Railway, D. G. Sm. 535; 64 English Reprint 237*, a case somewhat similar to this was brought to the attention of Vice-Chancellor Sir Knight Bruce. It appeared that the corporation was about to issue something over one million pounds of preferred stock, and the act was alleged to be *ultra vires;* the bill was filed by a holder of something like fifty-four shares out of a total of one thousand to enjoin the issuance of the stock. None of the stock had been issued at the time of filing of the bill, but 770,000 pounds had been subscribed for and a payment of some ten per cent. made on account. In the present case, the stock has been subscribed for by the syndicate. There has been no payment made on account. The report states that the court was of opinion that much more mischief was likely to be done by "interfering now in a manner from which the court might afterwards see reason to depart, than by declining to interfere upon the present occasion, although it might ultimately appear that the plaintiff was entitled to the interposition of the court." The court was therefore of opinion it ought not to grant the injunction; but it desired that it be understood as giving no opinion on the question of right.

I should, therefore, be inclined, in this case, under the circumstances, even though it appeared to me that there might be some doubt as to whether this company had the power to issue this stock, to decline to interfere at this stage of the proceedings, and that upon the ground referred to in the above-cited case.

The order to show cause will be discharged and the restraint vacated.