E. A. LANDRETH CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

E. A. LANDRETH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ADELLE H. LANDRETH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 15835, 16842, 16843.  Promulgated March 16, 1928.

*Claude Collard*, *C. P. A.*, and *M. M. Mahany*, *Esq.*, for the petitioners.

*Bruce A. Low*, *Esq.*, for the respondent.

4

8

14

OPINION.

MILLIKEN: Respondent has determined that from the date of the purchase of the Hale lease in April, 1920, petitioner was taxable as a corporation as that term is defined in section 1 of the Revenue Act of 1918, and section 2 of the Revenue Act of 1921. These sections provide that "The term 'corporation' includes associations, joint stock companies, and insurance companies." It remains to apply this definition to the facts as found.

Up to September 8, 1920, the date the deed of trust was executed, the contributors to the fund which was held and managed by E. A. Landreth had entered into no agreement as to their rights as between themselves or as to third persons. There was not even an understanding between them. The only testimony on this point is that of E. A. Landreth. On cross examination he testified:

Q. In discussing this matter with your bank, did you inform them at that time that you expected to perfect some sort of an organization?
A. No, sir.
Q. It was just between you and the members that this matter was understood?
A. We had not even an understanding with the members.
Q. Well, they were not led to believe, or they did not put their money into your charge under the assumption that it would remain a partnership or joint venture or something of that sort, did they? They expected you to make some sort of organization, perfect some sort of organization which would exempt them from liability?
A. They put their money in there solely on my responsibility and in any way I wanted to handle the proposition.
Q. Yes, sir; but was it the understanding that some sort of organization would be perfected whereby they would be exempted from further liability?
A. That never was brought up.
Q. You are positive as to that?
A. Absolutely.

It is clear that prior to September 8, 1920, the contributors had not attempted to secure a corporate charter; they did not constitute a stock company since they had issued no stock and had no authority to issue stock (33 C. J. 878); and they were not an insurance com-

pany. The question remains, Were these contributors during this period operating as an association? In *Hecht* v. *Malley*, 265 U. S. 144, it is said:

The word "association" appears to be used in the Act in its ordinary meaning. It has been defined as a term "used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise." 1 Abb. Law Dict. 101 (1879); 1 Bouv. Law Dict. (Rawle's 3d Rev.) 269; 3 Am. & Eng. Enc. Law (2 Ed.) 162; and *Allen* v. *Stevens* (App. Div.), 54 N. Y. S. 8, 23, in which this definition was cited with approval as being in accord with the common understanding. Other definitions are: "In the United States, as distinguished from a corporation, a body of persons organized, for the prosecution of some purpose, without a charter, but having the general form and mode of procedure of a corporation." Webst. New Internat. Dict. "[U. S.] An organized but unchartered body analogous to but distinguished from a corporation." Pract. Stand. Dict. * * *

A careful review of the testimony fails to disclose that during the period from April to September 8, 1920, the persons who contributed to the fund in the hands of E. A. Landreth conducted their business "upon the methods or forms used by incorporated bodies" or that their enterprise had the "general form and mode of procedure of a corporation." On the other hand, the evidence shows that at the beginning only E. A. Landreth was interested in the Hale lease and this solely by reason of the fact that the Metex Petroleum Corporation, for whose benefit the purchase was made, was financially unable to pay the price and handle the enterprise. Thereupon, E. A. Landreth first called upon his brother, who aided him by endorsing notes for borrowed money. Thereafter, and in June, 1920, others began to contribute. This continued until September 8, 1920, when all had contributed. It is shown that during this period E. A. Landreth carried on the business without consultation with the others. It appears that when he needed additional funds he secured them from whomsoever he pleased and without regard to the wishes or consent of the other contributors. The enterprise conducted up to September 8, 1920, was in the nature of a joint adventure. Cf. *Alger Melton* v. *Commissioner*, 7 B. T. A. 717. The fact that the Hale lease and the water rights stood in the name of E. A. Landreth does not detract from this view. In *Irvine* v. *Campbell*, 121 Minn. 192; 141 N. W. 108, it is said:

Real estate belonging to a partnership, whether the legal title be in one or more of the partners, is impressed with a trust for the benefit of the partnership, which follows it until it passes into the hands of a bona fide purchaser. *Arnold* v. *Wainwright*, 6 Minn. 358 (Gil. 241), 80 Am. Dec. 448; *Harvin* v. *Jamison*, 60 Minn. 348, 62 N. W. 394; *Stitt* v. *Rat Portage Lumber Co.*, 98 Minn. 52, 107 N. W. 824. The same rule applies where the parties engage in a joint enterprise the subject-matter of which is real estate. *Bond* v. *Taylor*, 68 W. Va. 317, 69 S. E. 1000; *Floyd* v. *Duffy*, 68 W. Va. 339, 348, 69 S. E. 993, 33 L. R. A.

(N. S.) 883; *Botsford* v. *Van Riper*, 33 Nev. 156, 110 Pac. 705; *King* v. *Barnes*, 109 N. Y. 267, 16 N. E. 332; *Withers & Gates* v. *Pemberton* 3 Cold (Tenn.) 56; *Davis* v. *Kellar*, 74 S. W. 1100, 25 Ky. Law Rep. 279; *Fueschsel* v. *Bellesheim*, 14 N. Y. St. Rep. 610; *Crenshaw* v. *Crenshaw* (Ky.) 61 S. W. 366; *Kauffman* v. *Baillie*, 46 Wash. 248, 89 Pac. 548; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035.

Taking all the facts into consideration, we are of the opinion that during the period April, 1920, to September 8, 1920, the enterprise was conducted as a joint adventure and that the contributors to the fund should be taxed as joint adventurers.

When we come to the trust agreement of September 8, 1920, a more difficult problem is presented. On this date for the first time the various contributors agreed upon a form of business organization. We say " business organization " for the reason that article 4 of the trust agreement provides that the company was authorized to conduct every branch of the oil and gas business from acquiring and selling oil and gas leases to refining and marketing the finished product, including the acquisition of franchises for and the installation and operation of pipe lines. The trust agreement also authorized the company to own and operate water plants and to sell water to individuals, corporations, and municipalities. The company was organized to transact business and the evidence shows that it did transact business. Cf. *Appeal of Durfee Mineral Co.*, 7 B. T. A. 231. The company had a capital stock represented by shares which were transferable but against the company only on its books. It had a name similar to a corporate name and a seal. It differed from an ordinary corporation or joint stock company only in that instead of having a board of directors, or trustees, as they are sometimes called, it operated through one person, styled a trustee, who for the term of the trust had uncontrolled authority in the management of its affairs and who was not subject to removal, except, of course, by a court for cause.

Respondent asserts that the company was an association and relies solely upon *Appeal of Durfee Mineral Co.*, *supra*. This case is not directly in point, since it was there found that the shareholders had a modicum of control over the trustees. Petitioner contends that since the shareholders could not and did not exercise any control over the trustee, the enterprise was a trust and, therefore, taxable as such, and cites *Williams* v. *Milton*, 215 Mass. 1; 102 N. E. 355; *Crocker* v. *Malley*, 249 U. S. 223; and *Hornblower* v. *White*, 21 Fed. (2d) 82, and attempts to differentiate *Hecht* v. *Malley*, 265 U. S. 144.

With respect to the fact that there was in the instant case but one trustee, it may be said that we do not think it can be successfully maintained that there could be no association or joint stock company if the sole trustee was subject to control of the shareholders. We pass, therefore, to the vital question—whether for income-tax pur-

poses such control is the distinguishing test between an association or a joint stock company, on the one hand, and a trust or partnership, on the other. We use the qualifying phrase " for income-tax purposes," since the classification of taxpayers by the various revenue acts controls as against the classifications adopted by State courts for State purposes. See *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110. This disposes of the fact that the Massachusetts courts hold that trusts similar in many respects to the company here involved are partnerships or pure trusts, depending on whether the beneficiaries can or can not exercise control over the trustees. It is immaterial for the purpose of this proceeding whether the Massachusetts courts would hold that E. A. Landreth Co. was a trust (*Williams* v. *Milton*, *supra*), or that the Texas courts might hold it to be a partnership (*Thompson* v. *Schmitt*, 115 Tex. 53; 274 S. W. 554). The question is not what this company would be deemed under the laws of either of these States or of any State, but what it was for income-tax purposes under the Revenue Acts of 1918 and 1921.

In *Hecht* v. *Malley*, *supra*, the case of *Crocker* v. *Malley*, *supra*, is discussed at length and the effect of its decision limited to the particular facts of that case. The *Hecht* case involved three " Massachusetts trusts," which are described by the court as follows:

The Hecht Real Estate Trust was established by the members of the Hecht family upon real estate in Boston used for offices and business purposes, which they owned as tenants in common. It is primarily a family affair. The certificates have no par value; the shares being for one-thousandths of the beneficial interest. They are transferable; but must be offered to the trustees before being transferred to any person outside of the family. The trustees have full and complete powers of management; but no power to create any liability against the certificate holders. There are no meetings of certificate holders; but they may, by written instrument, increase the number of trustees, remove a trustee, appoint a new trustee if there be none remaining, modify the declaration of trust in any particular, terminate the trust, or give the trustees any instructions thereunder.

The Haymarket Trust is strictly a business enterprise. It was established by the original subscribers who furnished the money for the purchase of a building in Boston used for store and office purposes. The shares are of the par value of $100 each. Except as otherwise restricted, the trustees have general and exclusive powers of management, but no power to bind the certificate holders personally. At any annual or special meeting of the certificate holders, they may fill any vacancies in the number of trustees, depose any or all the trustees and elect others in their place, authorize the sale of the property or any part thereof, and alter or amend the agreement of trust.

The Crocker, Burbank & Co. Ass'n is also a business enterprise. It was formerly entitled the Wachusett Realty Trust. The certificates have no par value; the shares being for ninety-six thousandths of the beneficial interest in the property. The trustees originally held the fee of certain lands subject to a long lease and the stock of a Massachusetts corporation engaged in

manufacturing paper and owning and operating several mills. In *Crocker* v. *Malley*, 249 U. S. 223 (1919), in which the original trust instrument was before the court, it was held that the trustees were not subject as to the dividends received from the corporation to the tax imposed by the Income Tax Act of 1913 (38 Stat. 172) upon the net income of "every corporation, joint-stock company or association * * * organized in the United States," but were subject only to the duties imposed by the Act upon trustees. The original trust agreement involved in that case has now, however, been modified, with the assent of the certificate holders. By this modification, "the form of (the) organization" was specifically "changed to that of an association," under its present name. The trustees were authorized to surrender the stock of the manufacturing corporation, to acquire instead its entire property, and to carry on the business theretofore conducted by it, or any substantially similar business. The title to all the trust property "and the right to conduct all the business" were vested exclusively in the trustees, who were authorized to designate from their number a president and other officers and to prescribe their duties. The certificate holders were authorized, at any meeting, to remove any trustee and elect trustees to fill any vacancies. Since the modification of the trust agreement, the trustees have carried on the manufacturing business in substantially the same manner as it was formerly conducted by the corporation.

The court, after quoting at length from its opinion in the *Crocker* case, said:

This opinion is based primarily upon the view that the Income Tax Act, considering its purpose, did not show a clear intention to impose upon the trustees as an "association" a double liability in reference to the dividends on stock in the corporation that itself paid an income tax, when considered as "trustees" they were by another provision of the Act exempt from such payment. And the language used *arguendo* in reaching this conclusion that the trustees could not be deemed an association unless all trustees with discretionary powers are such, and that there was no ground for grouping together the beneficiaries and trustees in order to turn them into an association—is to be read in the light of the trust agreement there involved, under which the trustees were, in substance, merely holding property for the collection of the income and its distribution among the beneficiaries, *and were not engaged, either by themselves or in connection with the beneficiaries, in the carrying on of any business. Zonne* v. *Minneapolis Syndicate*, 220 U. S. 187, 190, 31 Sup. Ct. 361, 55 L. Ed. 428. And see *Smith* v. *Anderson*, L. R., 15 Ch. Div. 247.

It results that *Crocker* v. *Malley* is not an authority for the broad proposition that under an Act imposing an excise tax upon the privilege of carrying on of business, a Massachusetts Trust engaged in the carrying on of business in a quasi-corporate form, in which the trustees have similar or greater powers than the directors in a corporation, is not an "association" within the meaning of its provisions.

We conclude, therefore, that when the nature of the three trusts here involved is considered, as the petitioners are not merely trustees for collecting funds and paying them over, but are associated together in much the same manner as the directors in a corporation *for the purpose of carrying on business enterprises*, the trusts are to be deemed associations within the meaning of the Act of 1918; this being true *independently* of the large measure of control exercised by the beneficiaries in the *Hecht* and *Haymarket* cases, which much exceeds that exercised by the beneficiaries under the Wachusett Trust. We do not

believe that it was intended that organizations of this character—described as "associations" by the Massachusetts statutes, and subject to duties and liabilities as such—should be exempt from the excise tax on the privilege of carrying on their business merely *because such a slight measure of control may be vested in the beneficiaries that they might be deemed strict trusts within the rule established by the Massachusetts courts.* (Italics supplied.)

The outstanding thought that runs through the whole of this opinion is that the " Massachusetts trusts " therein involved were associations for Federal tax purposes for the reason that the shareholders had associated themselves together under the form of a corporation for the purpose of engaging in a business. The *Crocker* case is distinguished, not on the ground that the shareholders could exert no control over the trustee, but on the ground that the Wachusett Trust was not engaged in business. Then follows the statement to the effect that where a trust is organized for the purpose of carrying on a business under corporate forms, it is an association independently of whether the beneficiaries exercised such a measure of control over the trustees as to constitute the trust a partnership under the laws of Massachusetts, and, on the other hand, that such a trust is an association even though it would be held by the Massachusetts courts to be a strict trust by reason of lack of such control. It thus appears that the court discards the test of control in determining whether such a trust is an association, under the revenue acts, and makes the test whether it was or was not organized for purely business purposes. This seems to be the true distinction. See Cook on Corporations, Vol. III (8th ed.), p. 2251.

In appeal of *Durfee Mineral Co., supra,* we said:

Shareholders have little or no authority practically, in any case, and it appears that the use of the control test, alone, is illogical and prolific of litigation and further confusion.

In the instant case the shareholders voluntarily entered into the trust agreement. The trust was not imposed upon them by a third person. They, themselves, granted to the trustee the authority covered by the trust agreement and whatever powers he exercised and whatever rights the contributors denied themselves arose from a contract voluntarily entered into by all the parties. These persons could have voluntarily conferred such authority upon trustees or directors for a specified term. There is nothing sacred in a one-year term for directors and there is no logical reason why such authority could not be conferred for a longer period. The vital question presented is not whether the absence of control of the trustee by the shareholders determined that E. A. Landreth Co. was a trust as distinguished from a partnership, but whether, under all the facts of this case, E. A. Landreth Co. was an association, even though the

shareholders had by contract voluntarily divested themselves of the right to control the trustee for the whole life of the company.

The nature of the right of stockholders to vote their stock is discussed at length in *General Inv. Co.* v. *Bethlehem Steel Corporation*, 87 N. J. Eq. 234, 100 Atl. 347. The facts in that case were that the Bethlehem Steel Corporation had originally a capital stock of $30,000,000, divided equally between preferred and common stock, all stock having voting rights. The corporation increased its capital stock by $45,000,000, all the new stock being common stock but none of which had voting rights. It was the intent of those who proposed the plan that the managment of the corporation should be retained by its old management. This plan was attacked on the ground, among others, that the purpose of the plan was to continue the old management, irrespective of the fact that the new issue, which was common stock, amounted to three-fifths of the entire capital stock, and that this would result in giving to a minority the control of the corporation. The court in holding the new issue of stock valid said :

It is almost impossible to get a definition of " common stock " or a statement of what classes of stock may be issued, and the necessary rights and privileges of the classes, that is satisfactory. Thompson, § 3426, in referring to common stock, says that the name itself indicates its nature, and it is so called because it is the common stock, or the stock which private corporations generally issue; and is usually the only kind authorized. He says the universal rule is that the owners of common stock are entitled to a pro rata dividend of profits, and to a pro rata participation in the management of the corporation; that the holders of common stock sometimes have a preference in the management of the corporation. In section 3425 with reference to classes of stock he states:

" The first general division of stock is into common or preferred stock; and these two classes are again subdivided into almost an infinite variety."

Section 859: " The rule that a right to vote follows the ownership of stock means only that in the absence of any common restriction upon all the stock, or upon a class of stock, this right prevails. That is, the right of a stockholder to vote can not be arbitrarily abridged and is not subject to universal restriction. But the rule is equally emphatic, if not so general, that restrictions may be placed upon the right to vote; or, as sometimes stated, the right to vote may be separated from the ownership of stock. *It must be remembered, in this connection, that stockholders can make any agreement respecting their stock, or the voting of it, that they may see fit or deem wise, except agreements that are void as against public policy.*"

He cites *Miller* v. *Ratterman*, 47 Ohio St. 141; 24 N. E. 496, Supreme Court of Ohio. There the question was as to whether preferred stock might be issued without voting privileges. The court said:

" It is true that one characteristic of stock, generally, is that it can be voted upon. *But this is not essential.* Indeed, instances may arise where it is good policy to prohibit the voting upon stock "—citing cases.

Thompson, § 859, contains the statement:

" So, it has been established that holders of preferred stock may be denied the right to vote the same at any meeting of the holders of the capital stock

of the corporation. The legality of such restriction is not based on the theory that preferred stockholders are guaranteed a dividend but rather on the inherent power of the corporation to restrict the voting power. It is simply a contract relation between two classes of stockholders, in which the public has no concern."

He instances a great number of cases where restrictions with respect to voting has been imposed upon common stock; i. e., one stockholder should not vote more than a fourth of the total, a stockholder should not vote more than 100 shares, nonresidents should not vote, purchasers of forfeited stock should not vote, even though not liable for the amount due until the amount due was paid.

"*There is no rule of public policy which forbids a corporation and its stockholders from making any contract they please in regard to* restrictions on the voting power." Cook on Corporations, § 622B.

"Inasmuch as preferred stockholders are members of the company, and except in so far as their rights may be altered by the contract, statute, or by-law under which the shares are issued, entitled in all respects to the same rights as other shareholders, it follows that they have the same voting rights as other shareholders. The right of shareholders to vote is, however, like the right to dividends or to participate equally in a division of capital on liquidation regarded as a private matter for each shareholder which he may waive if he choose. Consequently, a provision that shareholders of a certain class shall have no right to vote is, if assented to by them, quite valid. Such a provision might theoretically be made as to either the preferred or the deferred (Machen calls common deferred shares), but it is much more common with respect to the preferred shares so as to compensate the other shareholders for the preference of the preferred stockholders as to dividends." Machen, § 570.

"*A stockholder has no right to vote at corporate meetings, whether the stock is common or preferred, if it is so stipulated when the stock is issued, for the stipulation is then a term of his contract.*" 3 Clark & Marshall, p. 1996.

*Mackintosh et al.* v. *Flint P. M. R. Co.* (C. C.) 32 Fed. 350, and *Id.* 34 Fed. 582, is referred to in Clark & Marshall as authority for the proposition that preferred stock may be given the exclusive privilege of voting, at least in that case for a time. Counsel have not referred me to any case enunciating a public policy which would require that all common stockholders should have the voting privilege. In this state it has been held that the matter is purely one of contract. *McGregor* v. *Home Ins. Company of N. J.*, 33 N. J. Eq. 181; *In re Newark Library Ass'n.* 64 N. J. Law, 218, 43 Atl. 435. This seems to be the rule in the other states. (Italics supplied.)

The above case and the numerous authorities cited therein seem to make clear that stockholders can by contract deprive themselves of the right to vote the stock and thereby remove from themselves the right to control a corporation. This is precisely what the persons who signed the trust agreement did.

We are of opinion that the shareholders voluntarily associated themselves together under the name of E. A. Landreth Co. for the purpose of engaging in business, using that term in its broadest sense, under the methods and forms used by corporate bodies; that they did so engage in business; that the fact that they by voluntary contract delegated to the trustee powers which they might have

exercised, except for such delegation, in no way alters the fact that they constituted an association within the meaning of the Revenue Acts of 1918 and 1921; and that on September 8, 1920, there came into existence a new taxable entity which was taxable as a corporation, which possessed all the rights and privileges of a corporation for tax purposes, and that on that date the company acquired the assets theretofore held by E. A. Landreth for the benefit of his co-joint adventurers in consideration of the issue of its capital stock. In reaching this conclusion, we have not overlooked the decision of the United States District Court of Massachusetts in *Hornblower* v. *White, supra,* where the court adheres to the distinction which is drawn by the Courts of Massachusetts between trusts and partnerships. Until the Supreme Court expresses views at variance with their decision in *Hecht* v. *Malley, supra,* we feel called upon to follow what we believe to be the correct interpretation of that decision.

What we have said with reference to the E. A. Landreth Co. applies with equal force to Landreth Water Co. Both companies were taxable as associations.

Since the stock of both companies was held by the same persons and in the same proportions, respondent did not err in determining that the two companies were affiliated.

Petitioner contends that since respondent had once determined its tax for the year 1920 as shown by the letter of August 8, 1925, he could not thereafter redetermine the tax and on this point relies on section 1107 of the Revenue Act of 1926, which provides:

In the absence of fraud or mistake in mathematical calculation, the findings of facts in and the decision of the Commissioner upon (or in case the Secretary is authorized to approve the same, then after such approval) the merits of any claim presented under or authorized by the internal-revenue laws shall not, except as provided in Title IX of the Revenue Act of 1924, as amended, be subject to review by any other administrative or accounting officer, employee, or agent of the United States.

It appears that the determination made in the letter of August 8, 1925, and in the deficiency letter which is the basis of this proceeding, were made by the same officer, to wit, the Commissioner of Internal Revenue, and we know that the same individual held this office during the whole period involved. No administrative or accounting officer other than the Commissioner has attempted to review his first finding. This contention is without merit.

As shown in the findings of fact, the amount of $14,948.54 which petitioner claimed in his petition as a deduction in 1920 on account of labor and teaming expenses was in fact a capital expenditure made on the water plant which was transferred to the Landreth Water Co. Respondent is affirmed as to this item.

We have found that petitioner's interest in the Hale lease had a value as of September 8, 1920, the date of petitioner's organization, of $464,344.95 and that this amount included the value of the equipment which had theretofore cost $193,034.84. The exact cost of the equipment is shown and the value which we have placed upon petitioner's interest in the lease is, we believe, conservative. E. A. Landreth, who has had long experience in the oil and gas business, testified that this lease, including equipment, had a value on September 8, 1920, of from $500,000 to $750,000, and that in January, 1921, an offer of $600,000 was made for the lease. Petitioner introduced a computation made in 1927 which shows a higher value, but this computation contains facts which were not known in September, 1920. Taking into consideration the opinion of E. A. Landreth as to the value of the lease and the fact that an actual offer for it of $600,000 was made, we are of opinion that the lease and equipment was well worth $600,000 on September 8, 1920. Since the interest or control of the joint adventurers remained the same in the association formed on September 8, 1920, the invested capital could not be computed with an allowance greater than the cost of acquisition to the prior owners. See section 331 of the Revenue Act of 1918. Cf. *W. A. Sheaffer Pen Co.*, 9 B. T. A. 842. The amount of $464,344.95 should be included in the cost of the lease to petitioner in computing the gain or loss arising from its sale in 1921.

Next, petitioner asserts error as to respondent's determination of the depreciation sustained during the year 1920 upon the equipment on the Hale lease. There is no dispute as to the rate. We have found the original cost of the equipment to be $193,034.84. Depreciation should be computed upon this amount, plus any addition to the equipment that may have been made after September 8, 1920.

The losses incurred by petitioner in 1921 in the sale of the Hale lease and loss of equipment thereon and by the abandonment of the Vick, Mussbaum, Steuben Ranch, Graham, Stoker, and Baker-Gannon leases should be computed in accordance with the facts found.

Petitioner asserts that respondent erred in determining that the cost of the assets conveyed by it to the Landreth Water Co. was $81,916.11 instead of $60,224.44, which amount petitioner asserts was a true cost and that respondent erred in determining that said transfer resulted in a dividend in kind to the extent of $81,916.11. The allegation with respect to the first error was denied, and it may be pointed out in passing that although petitioner has proven that the property set forth in the findings of fact had a then market value of $50,000, it has failed to prove what was the cost of such property, and also what was the cost or value, if any, of the water

rights which were transferred at the same time. In the absence of such evidence, the determination of respondent as to the value of the property acquired by the Landreth Water Co. is approved. In so far as petitioner, E. A. Landreth Co., is concerned, only two results can flow from this valuation (1) what was the amount of loss on the sale of the assets of Landreth Water Co. in 1921, and (2) what was the amount of the consolidated invested capital as of October 28, 1920. On the first point, as above shown, there is not sufficient evidence to show that respondent's determination was erroneous. When we come to the second point, we find that respondent has reduced the consolidated invested capital by the amount of the value of the stock of Landreth Water Co., which was distributed by petitioner to its stockholders. While this distribution served to reduce invested capital of petitioner, E. A. Landreth Co., it could not reduce the invested capital of the group. To hold otherwise would be to lose sight of the well defined distinction between the statutory concept of invested capital and capital stock. The consolidated invested capital of the group could be neither increased nor decreased by transfers of shares of stock which did not "break up the affiliation." Cf. *Farmers Deposit National Bank*, 5 B. T. A. 520. Since it appears that respondent has reduced the invested capital of the group by the amount of the value of the dividend, this amount should be restored to the consolidated invested capital.

E. A. Landreth and Adelle H. Landreth, in their respective appeals, assert three errors. The first error alleged is to the effect that respondent erred in determining that the E. A. Landreth Co. and the Landreth Water Co. were associations. This contention has already been disposed of adversely to petitioners' contention. The second and third allegations are quite confusing and nothing can be found in the record which in any way indicates what was the basis upon which the amounts therein alleged can be predicated. It is sufficient to say that if E. A. Landreth Co. had on October 28, 1920, an earned surplus of equal or greater value than the value of the dividend as found by respondent, there was no error in respondent's determination in this respect. Since we are not informed as to what, if any, was the surplus of E. A. Landreth Co. on said date, respondent's action in determining that the whole of said dividend was taxable at surtax rates must be affirmed.

Reviewed by the Board.

*Judgment will be entered upon 15 days' notice, under Rule 50.*